188 So. 47

REINERS et al. v. HUMBLE OIL & RE-
FINING CO. et al.

No. 35114.

Feb. 6, 1939.

Rehearing Denied April 3, 1939.

Charles W. Phillips, and W. G. Randolph, both of Baton Rouge, James R. Fuller, of Bastrop, Gremillion & Mayeux, of Crowley, and Taylor, Porter & Brooks, of Baton Rouge, for appellants.

Jacob S. Landry, of New Iberia, and Herold, Cousin & Herold, of Shreveport, for appellee Jones-O'Brien, Inc.

Pugh & Buatt, of Crowley, for appellees R. W. Milner, Jr., and others.

Tinsley Gilmer, of Lake Charles, for appellee Humble Oil Co.

ROGERS, Justice.

This suit was originally brought by Mrs. Peter J. Reiners, as curatrix of the interdict Peter J. Reiners, and by William Edwin O'Neall, as lessee and assignee of certain mineral rights, against the Humble Oil & Refining Company and L. J. Jones to obtain the annulment of a certain mineral lease covering 246 acres of land

in what is known as the "North Crowley Area" in Acadia Parish.

The lease was executed by Peter J. Reiners to L. J. Jones and was assigned by Jones to the Humble Oil & Refining Company. Plaintiffs, at the same time, brought another suit against R. W. Milner, Jr., Independent Consulting Company, J. Brien Eby, F. J. Muller, Marrs McLean, P. L. Lawrence, R. W. McIllvain, and Jones-O'Brien, Inc., to obtain the annulment of certain mineral sales subsequently made by Peter J. Reiners. Plaintiffs set forth in both suits, as grounds of nullity of the various instruments attacked therein, that at the time he executed the instruments, for many years prior thereto, and at all times since, Peter J. Reiners was insane and incapable of administering his affairs; that his insanity was notorious; that he was known by those who generally saw and conversed with him to be mentally deranged; that the defendants named in the suits were aware of his insanity and incapacity and that none of them could have been deceived as to the state of his mind.

The Humble Oil & Refining Company filed an exception of non-joinder of necessary parties. The trial judge maintained the exception and ordered plaintiffs to amend their petition "by making the immediate mineral grantees of Peter J. Reiners and their respective vendees in title, the names of whom appear from the certified copies of mineral deeds annexed to and made part of the exception of non-joinder, above referred to, parties to this suit." In obedience to this order,

plaintiffs filed a supplemental petition in the original suit against the Humble Oil & Refining Company and L. J. Jones, impleading as parties defendant the mineral purchasers and their immediate mineral grantees, and, in addition to the relief asked against the original defendants, prayed for judgment against the said mineral purchasers and their mineral grantees, annulling the mineral sales and all subsequent transfers thereof.

As the result of the filing of the amended petition all the matters and things that could have been put at issue in the other suit were put in issue in this suit.

Before defendants filed their answer, Peter J. Reiners died intestate, and his widow, as surviving spouse in community, and his children, as his sole heirs, were judicially recognized as such and substituted as parties plaintiff.

All the defendants, except L. J. Jones, filed answer, denying all the essential allegations of plaintiffs' original and supplemental petitions, setting up their respective titles, claiming that they were purchasers in good faith, and alleging that Peter J. Reiners was sane at the time he executed the various instruments under attack. L. J. Jones failed to file any answer, and as to him, the suit was put at issue by the entry of a preliminary default.

The pleadings in the case are lengthy and the evidence is voluminous, but the issues involved are clear. They are, first, was Peter J. Reiners sane or insane in the years 1933 and 1934 when he executed the various instruments herein sought to be

annulled, second, if he were, was such insanity notorious, or did the parties dealing with him have knowledge thereof, and, third, are the plaintiffs, or any of them, estopped from questioning his mental capacity to execute the instruments?

After keeping the case under advisement for a number of months, the trial judge rendered a judgment in favor of the defendants dismissing plaintiffs' demands and recognizing the validity of the various instruments executed by Peter J. Reiners. The reasons assigned by the trial judge for his judgment are as follows:

"This case having been submitted on briefs and taken under advisement in the Parish of Vermilion, the Court rendered judgment rejecting the demands of plaintiffs and dismissing this suit at plaintiffs' costs, on the ground that Peter Joseph Reiners was, during the entire year of 1933, and for some five years prior thereto sane and capable of managing and administering his affairs and competent to contract and understood the meaning and purpose and legal effects of the contracts executed by him during said year and sought to be set aside and annulled herein; that if at the time of the execution of the mineral deeds, in the year 1934, by said Peter Joseph Reiners and sought to be annulled and set aside herein, the said Peter Joseph Reiners was insane and incapable by reason of such insanity, to enter into valid contracts such insanity was not notorious, and the purchasers of such minerals under said deeds were unaware of the insanity of said Peter Joseph Reiners and purchased said minerals in good faith and believing at the time that said Reiners was sane and capable of entering into valid contracts."

Contending that the findings of the trial judge are erroneous and that his judgment is incorrect, plaintiffs have appealed.

The various instruments signed by Peter J. Reiners, which plaintiffs seek to annul, are a mineral lease in favor of L. J. Jones executed on May 11, 1933, and an act correcting the description of the leased property executed on August 22, 1933, which lease was assigned by Jones to the Humble Oil & Refining Company; mineral sales to R. W. Milner, Jr., dated June 8, 1933; to F. J. Muller, dated June 15, 1933; to Jones-O'Brien, Inc., dated May 3, 1934, and to P. L. Lawrence, dated November 27, 1934.

Article 1788 of the Revised Civil Code, which is contained in the chapter covering the capacity of persons to contract, announces the following rules:

"2. As to contracts, made prior to the application for the interdiction, they can only be invalidated by proving the incapacity to have existed at the time the contracts were made.

"3. But in order to prevent imposition, it is not enough to make the proof mentioned in the last rule; it must also, in that case, be shown that the person interdicted was known by those who generally saw and conversed with him, to be in a state of mental derangement, or that the person who contracted with him, from that or other circumstances, was acquainted with his incapacity."

After announcing these two rules, the same article provides:

"9. That evidence of general and habitual insanity, in order to avoid a contract, may be rebutted by showing that the contract or act was made during a lucid interval; but where general insanity, even with some intervals, is shown, the burden of showing that the particular act in dispute was made during such an interval, is thrown on the party who supports the validity of the act or contract."

Plaintiffs, relying on rule 9 above quoted, take the position that Peter J. Reiners was generally and habitually insane and that the evidence, tendered by defendants for the purpose of proving that the instruments were executed by Reiners during lucid intervals, was inadmissible "on the ground that the defense of a lucid interval is a special affirmative defense, which must be specially pleaded, and not having been so pleaded, no evidence might be introduced in its support." We do not find any merit in the objection since all the defendants specially denied that Reiners was suffering from general or habitual insanity and specially alleged that he was sane at the time he executed the instruments herein attacked. The burden was on plaintiffs to establish the habitual and general insanity before the defendants could be called upon to show that the disputed instruments were executed during a lucid interval.

Under Article 31 of the Civil Code, "persons of insane mind are those who do not enjoy the exercise and use of reason, after they have arrived at the age at which they ought, according to nature, to possess it, whether the defect results from nature or accident. * * *" For the purpose of showing that Peter J. Reiners was such a person as is described in the codal article, plaintiffs produced thirty-two non-expert and three expert witnesses, together with certain records from the Central Louisiana State Hospital for the insane at Pineville and from the Louisiana Retreat, now the De Paul Sanitarium in New Orleans. For the purpose of showing that Peter J. Reiners was not such a person as is described by the codal article, defendants produced twenty-eight non-expert and three expert witnesses and a number of instruments appearing of record in the Parish of Acadia, which instruments were executed by Peter J. Reiners and the legality of which has never been questioned.

The record discloses that Peter J. Reiners was born on January 11, 1874 and that he died on May 13, 1936. In 1909, when he had reached the age of 35 years, he was placed in the Louisiana Retreat in New Orleans. After remaining in that institution for a period of a little less than two months, he returned home. In February 1911, he was placed in the hospital at Pineville where he remained until July 1, 1914, when he again returned home. Later, on three different occasions, Reiners was placed in the Louisiana Retreat where he remained for only short intervals. From November 11, 1922, when he left the Louisiana Retreat, until the date of his death, Reiners was never again placed in a hospital or an institution of any kind.

The record discloses that in the late fall of 1933, Peter J. Reiners, while operating a binder, suffered a physical impairment of his health, followed by paralysis of his right arm and leg, necessitating his partial confinement to his home.

Plaintiffs place much stress upon the fact that Reiners, at various times between the years 1909 and 1922, was a patient in the Pineville and New Orleans institutions. But a period of over eleven years elapsed between the last time Reiners was treated in the Louisiana Retreat and the time of the execution of the instruments under attack in this case. And the question presented for decision is not what was Reiners' mental condition in 1909, or 1911, or 1914, or 1922, but what was his mental condition in the years 1933 and 1934.

Plaintiffs insist that from November 1922 until January 1928, Reiners' general health was impaired and his mental condition was bad. They admit, however, that from January 1928 until March or April 1933, his general health was better and that he was able during that period to take an interest in his affairs, to work on his farm and to transact routine business with the aid and under the supervision of his family.

Peter J. Reiners was civilly interdicted by a judgment of the district court of Acadia Parish on February 1, 1935. But, as is provided by Article 402 of the Civil Code, "no act anterior to the petition for the interdiction shall be annulled, except where it shall be proved that the cause of such interdiction notoriously existed at the time when the acts, the validity of which is contested, were made or done, or that the party who contracted, with the interdicted person, could not have been deceived as to the situation of his mind. Notoriously, in this article, means that the cause of interdiction was generally known by the persons who saw and conversed with the party."

Before discussing the evidence bearing upon the sanity of Peter J. Reiners, we think it is well to briefly outline the manner in which this litigation arose.

The record discloses that Reiners was a married man, had four children, and that he owned and operated a rice farm of considerable acreage. In 1933, the Humble Oil & Refining Company employed the services of L. J. Jones to secure a block of acreage, which is located in what is now the North Crowley oil field. In approximately the center of this block is located the farm of Reiners which is involved in this litigation. Jones assembled between seven and eight thousand acres of land for the defendant Humble Oil & Refining Company and received for such service 25 cents an acre, together with a $\frac{1}{96}$ overriding royalty. Shortly after assembling the block of acreage, Jones, for a consideration of $5000, sold the overriding royalty to the Humble Oil & Refining Company. Therefore, at the time these suits were instituted and long prior thereto, Jones had no interest in the tract of land owned by Reiners. Mrs. Reiners and her children were apparently satisfied with the mineral lease held by the Humble Oil & Refining Company and the mineral sales executed in favor of the other defendants

until the latter part of the year 1934, when L. J. Jones approached them and represented that the instruments were illegal because Reiners had never been properly discharged from the Pineville institution. Prior to that time, no one had questioned the sanity of Reiners or the legality of his acts. Jones introduced O'Neall, the co-plaintiff, to Frank Reiners, the oldest son. O'Neall and Jones induced the widow to apply for the interdiction of Reiners and for her appointment as curatrix. O'Neall paid all the expenses of the interdiction proceeding and as soon as judgment of interdiction was obtained and the curatrix was qualified, he entered into a contract with the curatrix whereby he obtained a lease and acquired one-half of the mineral rights. The deed embodying this mineral lease and mineral sale provided for the payment of $4,000 cash and a one-eighth royalty and $4,000 additional in the event the deeds attacked were set aside. O'Neall further agreed to repay the amounts received by Reiners from those purchasing from him, to be deducted from the $4,000 to be paid, and also to stand all the expenses of the suit or suits to be brought to set aside the various instruments executed by Peter J. Reiners. Thereafter these suits were instituted.

The lease from Peter J. Reiners to L. J. Jones was executed in the presence of Mrs. Peter J. Reiners, Mrs. Anton Ohlenforst, a sister of the lessor, her husband Anton Ohlenforst, and F. J. Muller. On the same day that Jones acquired the lease from Reiners, he also acquired mineral leases, on the same acreage basis as paid to Reiners, from Anton Ohlenforst and also from J. Beecher Stakes, a near neighbor of Reiners and one of the principal witnesses for plaintiffs in this case. Neither Ohlenforst nor Stakes have brought suit to set aside their leases. The mineral sales from Peter J. Reiners to F. J. Muller, Jones-O'Brien, Inc., and P. L. Lawrence were also signed by Mrs. Peter J. Reiners. The sale to Jones-O'Brien, Inc., was witnessed by Anton Ohlenforst, a brother-in-law of Reiners, and the sale to P. L. Lawrence was witnessed by Frank Reiners, a son of the lessor.

The record discloses that Peter J. Reiners obtained as much, or more, for the leases and sale of his mineral rights as any other landholder in the same locality on the respective dates of the execution of the instruments. Reiners was extremely active in obtaining information from other interested parties before disposing of his mineral rights.

■ A number of plaintiffs' witnesses were produced to prove the general reputation of Peter J. Reiners for insanity. This testimony, which was admitted over the defendants' objection, fails to meet the test of notorious insanity as laid down by paragraph 2 of Article 402 of the Civil Code, reading as follows:

"Notoriously, in this article, means that the cause of interdiction was generally known by the persons who saw and conversed with the party."

Fourteen of plaintiffs' witnesses had business transactions with Peter J. Reiners at one time or another. Among these witness-

es are Mr. and Mrs. Anton Ohlenforst and J. C. Cramer, a first cousin of Reiners.

We shall refer briefly to the testimony of the principal non-expert witnesses produced by plaintiff.

Taking up first the testimony of Mrs. Peter J. Reiners, she stated that she never said her husband was crazy; that he never was crazy but never was a normal man. Many acts of Reiners ·which she stressed happened prior to Reiners' entry into the institution at Pineville and probably before he entered the· Louisiana Retreat, which he left the last time in 1922. Mrs. Reiners testified that, at the time the deed to P. L. Lawrence was signed, she thought it was legal and that she had the same idea with regard to all the other sales made by her husband.

Frank Reiners, in giving his testimony, made the general statement that his father was crazy, yet he admitted that when his father returned from the Louisiana Retreat he ran his own farm and that from 1927 his father got better until he became ill when operating the binder in the fall of 1933. He admitted that his father bought his own machinery; his own automobiles and drove them himself; that he never mortgaged his property and that he paid his bills promptly; that the family permitted his father to have and carry a gun. Although in referring to his father's condition on May 3, 1934, he stated that it was not good, he did not say that at that time his father was crazy or was incapable of handling his affairs; nór is it certain that his reference to his father's condition was to his mental and not to his physical condi-

tion. He further testified that during the years 1933 and 1934 he felt that everything was all right with reference to what his father had done with his property, and that he could buy ànd sell property if he wanted to. On November 26, 1927, Frank Reiners, for a consideration of $300 cash, conveyed to his father and mother six arpents of land which constituted a part of the acreage involved in this suit. He also acted as a witness to one of the mineral sales under attack in this suit.

Mrs. Anton Ohlenforst, a sister of Reiners, testified that since 1909 her brother had never been normal; that he stayed in the house quite a long time after his returñ from the Retreat in 1922. In 1928 and 1929 he began to improve and get about some; that in the spring of 1933 he had an automobile accident that made him very nervous and from that time he began to get worse; that in the fall of 1933, he had a breakdown and completely gave up and Mr. Ohlenforst had to look after his affairs to some extent. She admits that after returning from the Louisiana Retreat in 1922, Reiners worked on and improved his farm. She further admits that she discussed with Reiners the proposition of leasing lands that she and Reiners and others had inherited from their parents. This was about May 16, 1933, on which date she, together with Reiners and the other owners in indivision, leased to L. J. Jones the tract of fifty acres of land owned by them in common. This transaction took place five days after Reiners had executed the mineral lease herein sought to be annulled. It has never been attacked, probably because the lessors concluded that there were no minerals under the land.

Anton Ohlenforst testified substantially that in his opinion Reiners was mentally unbalanced and had been that way as long as he could remember; that he considered him an insane man at all times during thirty years prior to his death. He further testified that he, Mrs. Reiners, and the two sons of Reiners always helped to run the Reiners farm. He admitted that from 1922 to 1933 Reiners "at times was pretty good and at times not." He also admitted that merchants dealing with Reiners might consider him sane. He admitted that Reiners drove an automobile for many years and had only one wreck, and that the witness would not allow any insane member of his family to drive a car. Anton Ohlenforst acted as a witness to a deed executed on February 26, 1929, in which Peter J. Reiners sold to his brother, Will Reiners, his undivided one-half interest in and to 160 acres of land in Acadia Parish. He also acted as a witness to the mineral sale executed on May 3, 1934, to Jones-O'Brien, Inc.

J. C. Cramer was one of the witnesses who testified to the general reputation of Peter J. Reiners for insanity. He also testified that in his opinion Reiners was not sane. He testified, however, that Reiners borrowed $100 from him about 1924 or 1925. When the note evidencing the amount became due, it was paid by Reiners with his personal check. The witness further testified that he and Reiners helped each other out; that when he needed a little help he would get it from Reiners; that everything was friendly and satisfactory; and that he did not have any trouble with him because he knew how to take him.

Casper Berkin, who is a brother of Mrs. Reiners, testified that in his opinion Reiners was never a normal man; that he never improved but got worse all the time and that he had the reputation in the community in which he lived of being short-minded. He also testified that when Reiners was away from home he would brace up and try to act differently and that his condition would not be obvious, but that at home he would just let himself go. But the testimony of the witness, considered as a whole, shows that he was wholly unfamiliar with Reiners' business dealings and farming operations.

It is impossible to reconcile the statements of these witnesses that Peter J. Reiners was insane, or not normal, when they themselves transacted business with him, joined him in transacting business with others and in a judicial proceeding, and never warned persons dealing with him that he was mentally ill. It was not until the oil excitement arose in their neighborhood that they suddenly discovered that Reiners was notoriously insane instead of being merely a sick man.

Plaintiffs rely strongly on the testimony of L. J. Jones who took from Peter J. Reiners, for the Humble Oil & Refining Company, the lease under attack in this suit. The witness lived in Crowley about thirty years and had known Reiners almost that long. He testified very freely that in his opinion Reiners was a crazy man; that he had been in that condition ever since he knew him; that he looked like a man that was mentally deranged; that it was generally the public opinion that he was crazy; that he also knew that Reiners had

been in the hospital at Pineville. The witness, however, does not go so far as to testify that he took advantage of Reiners or that the price paid him for the lease was not a fair one. On May 16, 1933, Peter J. Reiners and his co-owners executed, in favor of L. J. Jones, a mineral lease covering fifty acres of land inherited from their parents. This is the instrument hereinabove referred to as being witnessed by Anton Ohlenforst. The testimony of both Jones and Ohlenforst is to the effect that they thought Reiners understood what he was doing in executing the lease, and the testimony of J. B. Stakes, also a witness for plaintiffs, is to the effect that Reiners discussed with him the execution of the lease and the amount he received therefor. Again, on May 18, 1933, Dennis Quibodeaux, a neighbor of Peter J. Reiners, executed a mineral lease in favor of L. J. Jones covering eight acres of land in Acadia Parish. This instrument was witnessed by Reiners.

It is exceedingly strange that if Jones knew that Reiners was insane and was generally so regarded, he accepted a lease from him and later transferred the lease to his principal for a substantial consideration. It is also exceedingly strange that Jones subsequently endeavored, without success, to purchase from Reiners the mineral rights that were sold to F. W. Muller, and that it was not until the transaction with Muller had been completed that Jones, for the first time, told the Reiners that "all of the deeds are no good" as Reiners was not properly discharged from the Pineville hospital.

In these circumstances and considering that Jones was instrumental in fomenting this litigation, and by his own admission, has a one-seventh royalty interest depending upon the outcome of this suit, we are unable to accept his testimony as worthy of belief.

J. Beecher Stakes is the person with whom Peter J. Reiners discussed the execution of the mineral deed of May 16, 1933, to L. J. Jones covering fifty acres of inherited property. He testified that in his opinion Peter J. Reiners was insane and that he was so regarded in the neighborhood in which he lived. However, the witness admitted that he had sold Reiners some seed rice in 1929 and also that he had threshed rice for Reiners in the years 1921, 1922, or 1923, and 1930; that Reiners was a good farmer; that he had at different times helped Reiners and Reiners had also helped him. The witness does not testify that any of his business dealings with Reiners were unsatisfactory, or that Reiners had not fully appreciated what he was doing. On the contrary, in connection with the purchase of seed rice by Reiners, Stakes testified that Reiners understood the transaction and that he considered him sane at that time.

J. D. Gielen had known Peter J. Reiners intimately since they were school boys and at one time had owned and operated the farm adjoining the farm of Reiners. He testified that there was always something wrong with Reiners; that he supposed he was crazy; he acted crazy, and they said he was crazy and took him off to Pineville. But the witness admitted that

in the fall of 1933, Reiners went to Crowley, where the witness was then living, and employed him to haul rice and sew sacks. Reiners fixed the compensation to be paid for the work and also personally loaded Gielen's trucks or saw that they were loaded while Gielen was engaged in sewing the sacks. Moreover, on April 26, 1930, Gielen and Reiners executed two deeds, one conveying 29.20 acres of land · for a consideration of $600 from Reiners to Gielen, and the other conveying 21.60 acres of land for a consideration of $400 from Gielen to Reiners. The transaction had been talked about between the contracting parties for three or four years and its purpose was to adjust the lines of their respective properties so that each would have all his property located on the same side of a gully running between the properties. From this it is clear that Gielen, in spite of his testimony, must have thought that Reiners was sane enough to deal with in the business transaction and to convey a good title to real estate.

Mr. O. Broussard lives in Rayne and has been in the drug business there since 1892. He has been alderman and mayor of the town and a member of the parish school board and was president of the Bank of Rayne from 1902 until 1931. He testified that he had known Reiners all his life; that it was the common rumor around Rayne that he was insane but he could not fix the date of the rumor; that he knew that Reiners had been in the asylum. Nevertheless, he testified that Reiners carried an account in his bank in his own name, checked against it and that the bank

honored his checks; that Reiners bought drugs and medicines at his store and that he served him; that he sold Reiners what he desired and considered that Reiners knew what he was doing when he made the purchases; that Reiners never made any foolish purchases but that all his purchases were reasonable; that he was a conservative buyer and also conducted himself like any other customer; that if Reiners had requested credit, he would have extended it.

Plaintiffs apparently consider H. Leo Habetz one of their most important witnesses. He is an intimate friend of the Reiners family and seems to have acted as their adviser and to have taken an active part in the prosecution of their claims against the defendants. The witness testified that in his opinion Reiners was crazy and he related some unimportant incidents to sustain his opinion. He admitted that he never had any business dealings with Reiners and was wholly unfamiliar with his affairs. It is apparent from an examination of his testimony that he knew little, if anything, about what was going on on the Reiners farm until the latter part of 1934 or the early part of 1935. Moreover, he acted as the notary when Reiners sold to Gielen and Gielen sold to Reiners in 1930, and also when Reiners sold to his brother, Will Reiners, in February 1929, his undivided interest in a 160 acre tract of land in Acadia Parish. He also permitted Reiners to act as a witness to a deed executed before him on February 10, 1928, in which Frank Reiners sold to H. J. Thevis 47.64 acres of land in Acadia Parish.

The testimony of the other witnesses produced by plaintiffs is of the same character and to the same effect as that of the non-expert witnesses whose testimony we have discussed.

We will now review the testimony of defendants' non-expert witnesses so far as it relates to business transactions entered into with them by Peter J. Reiners.

Mason Robinson lived in the same locality as Reiners and knew him for fifty years. He testified that from 1928 through the fall of 1933 Reiners' mental condition was as good as his; that he worked just as he did; that he would engage in discussions as intelligently as any one else; that his conversation, even after he was hurt in the fall of 1933, was intelligent; that he ran his farm; that he knew values; that he compared mineral prices with the witness; that he received as much for what he leased or sold as he did; that he was sure Reiners was not crazy during the nine years prior to his interdiction and that he worked during all that period.

Richard Robinson worked for Reiners for a number of years including the fall of 1934. He testified that Reiners was a first class farmer and issued all instructions to his employees; that on one occasion he asked Reiners if he knew any one who was interested in purchasing minerals and if so, to refer the prospective purchaser to him; Reiners sent Dr. Francez to him. The witness made a sale to Dr. Francez, who paid him by check, and he gave the check to Reiners who brought it to town, cashed it, and brought the money back to the witness. He testified that after Reiners became ill while operating a binder in 1933, his mind was not affected; that he still operated his farm; that in the fall of 1934, Reiners was still in a good condition mentally, although there was something wrong at that time with his right hand and leg.

Euclid Beard was a close neighbor of Reiners and talked to him often in the fall of 1933. He testified that Reiners talked rationally and had a good mind. He stated that he worked for Reiners and that Reiners was a successful farmer and had good crops; that he had heard no one say in 1934 that Reiners was crazy; that Reiners was partially paralyzed, but apart from that, he was like an ordinary man in 1933; that no one could put anything over him; that Reiners was not crazy but sick.

Arville Beard owns land adjoining Reiners' farm, and in addition thereto, farms the Mervin Kahn property, likewise adjoining Reiners' property. The witness lives within a half mile of the Reiners home. He testified that he worked for Reiners, the last time being in 1932; that he had other business dealings with Reiners, all of which were satisfactory; that Reiners always seemed to be normal and discussed mineral sales with him; that there was nothing unusual in Reiners' physical or mental appearance, nor in his conversation and that Reiners was sane; that after Reiners became ill while operating a binder in 1933, he rode to the witness' home on horseback and the witness did not notice any change in him.

Rufus Harmon was a neighbor of Reiners and he also worked for him. He saw

Reiners in the fall of 1933 and Reiners was not crazy. At that time he conversed sensibly and like any normal person and there was nothing about his appearance that would attract attention.

Leo Kahn is president of Mervin Kahn Company, one of the largest mercantile establishments in Rayne. He stated that he had numerous business dealings with Reiners, and he was one of his best customers; that he extended Reiners lots of credit and that Reiners was a shrewd buyer; that Reiners' condition was that of an ordinary human being, there being nothing unusual about what he said or did; that in all his dealings with Reiners, he acted as any sane person would act. The testimony of Leo Kahn was confirmed by Julius Kahn who is also associated with the Mervin Kahn Company of Rayne.

Arnold Kahn is a retail druggist. He testified that, as shown by his sales slips, Reiners was in his store in May, August and September of 1933; that for years he sold Reiners lots of merchandise, both on credit and for cash; that his business relations with Reiners were extremely satisfactory. When asked as to whether, from 1927 through the fall of 1933, Reiners was sane or insane, he answered, "as far as I know and in conversation, it was always very regular. It was just the same as any one I ever knew."

Dr. Z. J. Francez is a practicing physician and has been coroner of Acadia Parish for about 26 years. He testified that for a period of 35 years he had been connected off and on with the oil business;

that in his capacity as coroner, he received reports of all persons in the parish who were notoriously insane, but he had never heard that Reiners was insane; that his official duties required him to handle cases of insanity, and that during his incumbency in the office he handled a number of such cases. The witness testified that he first met Reiners in a political way and that he appeared to be all right; that the first time he had any business dealings with Reiners was when he purchased some minerals for the account of R. W. Milner and at that time Reiners appeared perfectly normal; this transaction took place in June 1933; that the next time he saw Reiners was when he purchased the royalties for J. C. O'Brien. This transaction took place in 1934; that at that time Reiners appeared to be physically sick but not mentally sick and that no member of the Reiners family or any one else suggested that Reiners was incapable of making the contract. The witness further stated that he never heard any one say anything about the mental condition of Reiners in the year 1934; that the first time he heard it was when O'Neall was about to bring this suit.

John Harmon, a near neighbor, testified that one time he borrowed $1000 from Reiners who knew values and that Reiners was not crazy.

L. A. Williams was a notary public. He took an acknowledgment by Reiners of a deed Reiners had witnessed in June 1933. He testified that at that time Reiners was perfectly rational and his demeanor perfectly normal.

R. C. Holt was formerly a bank cashier. He testified that Reiners had an account with his bank, borrowed money, made deposits and checked against his account; that his relations with Reiners were satisfactory. He also did some insurance business with Reiners who knew when his premiums became due and paid them promptly. He considered Reiners sane.

A number of other witnesses testified on behalf of defendants as to the physical and mental condition of Reiners, the manner in which he conducted his affairs, and as to business dealings had with him. In all, twenty-eight witnesses testified for the defendants. These witnesses came from all walks of life,—merchants, bankers, druggists, farmers, insurance men, abstracters, notaries, grocers,—and all of them, without exception, stated that Reiners appeared to be sane and that any one who met and conversed with him would not be impressed otherwise.

For the purpose of showing that Peter J. Reiners, for a period of at least six years prior to the mineral lease to the Humble Oil & Refining Company, was generally regarded as sane by members of his family, his neighbors and other persons, defendants offered in evidence a number of instruments appearing of record in Acadia Parish, the legality of which has never been challenged. These instruments are a sale of real estate, by notarial deed, executed on November 26, 1927, by Frank Reiners to Peter J. Reiners and Mrs. Peter J. Reiners; a sale of real estate executed on November 10, 1928, by Frank Reiners to H. J. Thevis, before H.

Leo Habetz, notary public, which was witnessed by Peter J. Reiners and Anton Ohlenforst, his brother-in-law; a sale on February 26, 1929, by Peter J. Reiners to his brother Will Reiners of an undivided interest in real estate, by notarial act executed before H. Leo Habetz, notary public; proceedings filed in March 1929, in the succession of Frank and Veronica Reiners, the father and mother of Peter J. Reiners, the petitioners in which were Peter J. Reiners and the other children and heirs of the decedents; an act of chattel mortgage executed on August 31, 1928, by Peter J. Reiners in favor of the Meyer Chevrolet Company, Inc., to secure $465 representing the credit portion of the purchase price of a new Chevrolet sedan, which chattel mortgage note was paid at maturity and the mortgage duly cancelled; an act of chattel mortgage, executed on May 9, 1930, by Peter J. Reiners in favor of the Meyer Chevrolet Company, Inc., to secure $300, representing the credit portion of the purchase price of a new Chevrolet sedan; act of sale executed on April 26, 1930, in which Peter J. Reiners conveyed to J. D. Gielen 29.20 acres of land located in Acadia Parish; an act of sale executed on April 26, 1930, by J. D. Gielen to Peter J. Reiners of 21.60 acres of land located in Acadia Parish; a mineral lease executed on May 16, 1933, by Peter J. Reiners and others in favor of L. J. Jones, covering fifty acres of property inherited by the lessors from their parents; a mineral lease executed on October 9, 1933, by the parties to the mineral lease of May 16, 1933, correcting the description of the property embraced in the latter lease; a

mineral deed executed on June 16, 1933, by Leonard Stark in favor of Maxwell Duson, covering forty acres of land in Acadia Parish, which instrument was witnessed by Peter J. Reiners and acknowledged by him before L. A. Williams, notary public; a mineral lease executed on May 18, 1933, by Dennis Quibodeaux in favor of L. J. Jones, covering eight acres of land in Acadia Parish, which instrument was witnessed by Peter J. Reiners.

Six psychiatrists testified in the case, three on behalf of plaintiffs and three on behalf of defendants. There is considerable conflict in the testimony of these respective groups of witnesses. Two of the experts, who testified for plaintiffs, examined Peter J. Reiners in March 1935. Each of the examinations was very brief. They testified that at that time, in their opinion, Reiners was an old, deteriorated, dilapidated dementia praecox, and that their opinions were confirmed by a study of the testimony of the non-expert witnesses. They were corroborated by plaintiffs' third expert, who based his opinion on their testimony and on the testimony of non-expert witnesses.

The theory of plaintiffs' experts, as revealed by their testimony, is that Reiners was a dementia praecox and that he was a well established dementia praecox as early as 1914, at which time deterioration had already set in; that after the disease becomes well established, it is progressive in character and that mental deterioration continues until profound dementia results. They further stated that a person suffering from dementia praecox was capable of doing simple routine acts if the acts were done under supervision. They admitted, however, that a number of acts performed by Reiners without supervision during the period elapsing between the latter part of the year 1907 until the latter part of October, 1933, when Reiners became ill while operating a binder, were not of a routine character; that these acts were not such as could be reasonably expected to be performed by a well established dementia praecox, or by an insane man of any classification.

Plaintiffs' experts make much of the fact that Reiners was a patient for three and a half years in the hospital at Pineville from 1911 to 1914, and that he was a patient on four separate occasions for short periods in the Louisiana Retreat at New Orleans. But the psychiatrists who examined and treated Reiners at the Pineville institution diagnosed his trouble, as the record discloses, as "manic-depressive, depressed type." These psychiatrists had the advantage of seeing, observing and treating Reiners long before his disease had reached the terminal stages. Reiners was discharged from the Louisiana Retreat on November 11, 1922. Thereafter he was never again sent to any hospital or institution.

Plaintiffs introduced in evidence what appears to be a copy of Reiners' card record at the Louisiana Retreat. This card record shows a diagnosis of "dementia praecox with alcoholism." The card record, however, does not appear to be the original record, and Dr. H. R. Unsworth, who was the physician in charge of the

Louisiana Retreat from December 9, 1929, until January 1, 1936, testified that the original records had become lost. He further testified that these records, which were written entirely in long hand, were before him when he addressed a certain letter to Mr. Gilmer, attorney for the Humble Oil & Refining Company, and that they contained the dates of the four admissions and the dates of the four discharges of Reiners from the institution with a diagnosis each time of psychasthenia. Plaintiffs objected to this evidence of Dr. Unsworth, but did not attempt to contradict it. Counsel for defendants requested the court and plaintiffs' counsel for permission to re-open the case for the purpose of allowing either side to introduce further evidence with respect to Reiners' hospital records in the Louisiana Retreat. Counsel for plaintiffs refused the request and, in view of an agreement previously entered into between counsel, the court was unable to re-open the case over plaintiffs' objection.

It appears from the medical evidence in the record, as we understand it, that psychasthenia is merely a nervous complaint, while dementia praecox is a type of insanity. The medical authorities referred to in the briefs of counsel are in accord and to the effect that certain forms of manic-depressive psychosis and certain forms of dementia praecox present characteristic difficulties; particularly in the mixed forms, and that it is difficult to distinguish one form of insanity from the other, and are further in accord that the history of repeated attacks without mental deterioration is a clear indication of manic-

depressive psychosis. Thus, in the recent work of William S. Sadler, 1936 Edition, on "Theory & Practice of Psychiatry," we find the following, on page 831:

"Diagnostic confusion occurs in certain forms of manic-depressive involvement of the mixed type. In these cases the most helpful factor is the history of repeated attacks without deterioration. This points definitely toward the manic-depressive condition."

One of plaintiffs' expert witnesses testified that in the terminal stage of mental diseases, certain types of dementia praecoxes and certain types of manic-depressives are similar, and that it takes an experienced person to differentiate the types. And one of defendants' expert witnesses testified that in a terminal stage it was impossible to differentiate these conditions.

In March 1935, when plaintiffs' two experts saw Reiners for the first and only time, he was paralyzed in his right hand and right leg and admittedly was a sick man; in fact, he was so sick that he died within a short time thereafter.

Apparently no effort was made by defendants' experts to classify the nature of Reiners' illness. As shown by their testimony, they read the entire record and from the facts revealed therein, they arrived at the conclusion that any person capable of doing the things which were done by Reiners, over a long period of time, could not be insane. Thus, Dr. S. J. Phillips, who is superintendent of the hospital at Pineville, on being asked the direct question whether he agreed with plaintiffs' experts, who examined Reiners

in March 1935, when he was past sixty years of age, in classifying Reiners as an old, deteriorated, dilapidated dementia praecox, stated that he did not, and that it was difficult for him to reconcile the actions of Reiners over the period of years with an old, deteriorated, dilapidated dementia praecox. This witness further stated that if Reiners did the things over the period which the non-expert witnesses under oath said he did, "he was either in a period of satisfactory remission or else there must have been an error in the diagnosis."

The qualifications of the experts who testified on each side of the case were not questioned by the attorneys for the parties litigant, and they were accepted by the trial judge. The experts for plaintiffs gave, as their opinion, that Reiners was insane during the entire years of 1933 and 1934. The experts, who testified for defendants, were equally positive that Reiners was sane during the entire year of 1933, but that from the state of the record they were unable to determine, with any degree of certainty, the date his mental faculties became finally impaired. The testimony of the experts reflects merely their respective opinions based on the facts developed as they understood them.

It may be that the testimony of plaintiffs' expert witnesses, as well as the testimony of their non-expert witnesses, was unconsciously affected by the fact that Reiners was a patient in the Pineville hospital and in the Louisiana Retreat many years before they testified. So far as the opinions of defendants' expert witnesses as to the sanity of Reiners is concerned, they seem to be wholly consistent with the facts as shown by a preponderance of the evidence in the record.

After all, the question of Reiners' sanity or insanity presents an issue of fact. That issue is not for the experts to decide, but it is for the court to decide upon all the evidence submitted for its consideration.

Looking at the case in its broader aspects, it would appear that Reiners was ill in 1909, and that from 1911 to 1914 he was a patient in the hospital at Pineville. Before he was placed in that institution, as shown by the record, he drank to excess and whatever acts of an eccentric nature he was said to have committed were done about that time. He returned to his home in 1914 and remained there until 1919. From 1919 to 1922 he was, on three occasions for short intervals, placed in the Louisiana Retreat in New Orleans. His final discharge from that institution occurred in 1922. He was never again sent to any hospital or similar institution.

The preponderance of the evidence shows that during the period from 1922 to 1927, Reiners greatly improved in health; that from 1927 through the fall of 1933, he was in sufficient possession of his mental faculties to know what he was doing and to administer his property. During this period it is abundantly shown that Reiners was an extremely active person, actually running his farm, employing, directing and paying the farmhands, buying the necessary machinery and equipment, selling the products, buying and operating his automobile, and engaging in numerous real estate and other business transactions.

It was not until about January 1935 that he became both physically and mentally incapacitated.

The record shows that Reiners executed the lease and mineral sales involved herein for a fair consideration; that he obtained for the lease the same consideration as did other lessors in that neighborhood and that he obtained for his minerals more than other vendors in the vicinity, and there is nothing in the record that even suggests that the defendants were guilty of any overreaching or unfairness in their dealings with Reiners. And certainly the record fails to show that the defendants knew, or had reason to know, that Reiners was not mentally competent when they dealt with him.

The trial judge heard all the witnesses and examined all the documents produced in the case, and his findings, which we have reproduced in the beginning of this opinion, were wholly favorable to the defendants. We find nothing in the record to justify us in disturbing his findings.

For the reasons assigned, the judgment appealed from is affirmed.