# Cawood et al. v. Hall Land & Mining Co. et al.

Jan. 26, 1943.

24

E. C. O'Rear and Allen Prewitt for appellant.

H. C. Gillis for appellees.

OPINION OF THE COURT BY CHIEF JUSTICE FULTON— Reversing.

This action was filed by the widow, heirs at law and personal representative of S. M. Cawood against the Hall Land & Mining Company and others for an accounting and other relief under a coal lease. The appeal is from a judgment dismissing the petition upon the merits. Appellees cross-appeal from the judgment dismissing their counterclaim, which sought recovery of $13,000 alleged to have been overpaid appellants.

Only two items are involved on the appeal, 1) the right of appellants to royalty on 350,000 tons of coal

which appellants contend would have been mined had the mining operations been prosecuted with due diligence and 2) the right of appellants to compensation for haulage under ground on the leased property of coal mined on adjacent property.

On June 1, 1920, S. M. Cawood leased to W. F. Hall and F. F. Cawood (who were partners operating as the Lenarue Coal Co.) a described tract of 200 acres for coal mining purposes "for a period of fifty years and until all the coal is mined and shipped from said lands." The lessees, Hall and Cawood, then owned and had under lease adjoining coal lands aggregating more than 600 acres, as recited in the lease. The lease recited that the respective properties "shall be treated and considered as one property for mining purposes and parties of the first part shall receive each month their royalties for the coal mined and shipped at 12c per ton to correspond with his acreage of coal in the Harlan seam, and the royalties from the remaining acreage to correspond with the number of acres of coal of parties of the second part shall belong to parties of the second part. The royalties of parties of the first part for the time being and until the surveying and engineering is done shall be three (3c) cents per ton for the output of Lenarue Coal Company to commence June 1, 1920 and continue each month."

The lessees agreed to prepare a suitable and customary lease, which the lessors agreed to execute. However, no such lease was ever prepared or executed and operations continued under the provisional lease. No minimum rental or royalty was provided and it contained no express standard of diligence further than the provision contained in the above quoted language that the royalties should "continue each month."

The final paragraph of the contract was as follows:

"Parties of the second part when the lease is prepared are to have a right-of-way over the parties of the first part underground to haul and remove to the Lenarue Coal Company's equipment any coal they may own beyond the lands of party of the first part free of any charge."

As the Lenarue Coal Company, the lessees, Hall and Cawood, operated the mine until September 17, 1925. On that date they leased their own property for coal and sub-leased or assigned appellants' property to the South-

ern Harlan Coal Company. The lease called for 21c per ton royalty on all coal mined from the pooled premises and also provided a minimum royalty of $14,700.

On September 3, 1932, the widow and heirs of W. F. Hall incorporated their interests as the appellee Hall Land & Mining Company and the action was therefore filed against the latter company, F. F. Cawood and the widow, heirs at law and personal representaive of W. F. Hall. The Southern Harlan Coal Company was named as a party defendant but no process was executed on it.

The Southern Harlan Coal Company continued mining operations on the pooled properties until March 13, 1935. It then secured a lease on adjoining lands of the Alabama Fuel Company and all coal thereafter mined was on the latter lease. Coal thus mined was transported underground to the drift mouth of the mine which was on that part of the pooled property owned by the lessees. Nine per cent of the underground haulage route was on appellants' leased property.

When Southern Harlan secured the lease on the Alabama Fuel tract, the Hall estate and F. F. Cawood granted to it haulage rights through the entire pooled area, including the S. M. Cawood tract, to the original Lenarue tipple. For this privilege Southern Harlan agreed to and did pay 6c per ton on all coal mined on the Alabama Fuel tract. At the time of the trial this amount was 382,769 tons. It was proven, however, that of this 6c per ton 4c represented a reasonable charge for the use of equipment owned by the Lenarue Company and 2c per ton represented reasonable compensation for the haulage route. Appellants sought a recovery of the entire 2c per ton on the total number of tons hauled, or $7,655.28 on this account.

The mining operations on the pooled property, which continued up to March 13, 1935, were conducted on what is known as the common retreat system and the evidence discloses that on the latter date 350,000 tons of minable coal remained in the pillars and stumps. Had not mining operations continued beyond the pooled property into the Alabama Fuel lease, these pillars and stumps would have been mined and in the course of the mining the roof of the mine would have fallen. The 350,000 tons contained in the pillars and stumps could have been mined in six years in the ordinary course of mining operations.

It is appellants' claim that they are entitled to the 3c per ton royalty on the 350,000 tons, which they claim would have been mined had their lessees operated the mine with due diligence and had they not permitted the mining on the Alabama Fuel tract to delay and hold up the completion of mining operations on the pooled property.

By counterclaim appellees sought to recover of appellants $13,000 in royalties alleged to have been overpaid. It was alleged that it was the intent and purpose of the contract that S. M. Cawood should receive royalties from the combined properties in such proportion as his area or tonnage of coal in the Harlan seam which could be mined at a profit bore to such area or tonnage on the property owned by Hall and Cawood; that the 3c per ton royalty on all coal mined on the pooled properties was payable only until the proper proportion of minable or marketable coal was determined by survey, at which time a readjustment was to be made. It was then alleged that the minable and marketable coal on appellants' property, as determined by the mining operations, constituted only 8.1% of the minable and marketable coal on the combined properties and that consequently appellants were only entitled to, and should have received, royalties on the coal mined and marketed, and not exceeding 1c per ton, and should be required to refund to appellees 2c per ton on all coal on which they had received royalties, amounting to approximately $13,000.

Proceeding, first, to a consideration of appellees' contention that the judgment was erroneous in dismissing the counterclaim, we may say that this contention appears to be completely lacking in merit. The effect of the quoted provision of the lease dealing with royalties was that the lessor was to receive from coal mined and shipped from the pooled properties that part of 12c per ton which his acreage of the Harlan seam bore to the total acreage of that seam in the pooled properties. Were there any doubt as to the correct construction of these provisions, and we think there is none, such doubt was removed by the construction placed thereon by the parties in continuing the payment of 3c per ton royalty on all coal mined on the pooled properties over a long period of years. The chancellor correctly dismissed the counterclaim.

The right of appellants to royalties on the 350,000

tons of coal contained in the pillars and stumps depends upon the intention of the parties to be gathered from the terms of the contract or lease and this intention is to be determined in the light of the substantive law and settled rules of construction.

It is appellants' theory that pursuant to the contract there was an implied obligation on the part of appellees, the lessees, to mine the coal on the pooled properties within a reasonable time. Appellees, on the contrary, insist that since the lease provided that it was to run for a period of fifty years and until all the coal was mined and shipped, no obligation was imposed to complete the mining before the expiration of fifty years. This latter position is, we think, untenable. The fifty year and "until all the coal is mined" provision supplies the customary term or extreme limit of the grant and was not intended as a measure of diligence. The authorities seem to be in accord that under a lease of this nature containing a provision for the payment of royalties it is the lessee's duty to develop the leased premises to the mutual profit of himself and the lessor and included in this duty is the obligation to mine the product within a reasonable time. Eastern Kentucky Mineral & Timber Co. v. Swann-Day Lumber Co., 148 Ky. 82, 146 S. W. 438, 46 L. R. A., N. S., 672; Killebrew et al. v. Murray et al., 151 Ky. 345, 151 S. W. 662; Freeport Sulphur Co. v. American Sulphur Royalty Co., 117 Tex. 439, 6 S. W. (2d) 1039, 60 A. L. R. 890, and cases cited in the A. L. R. annotation.

It clearly appears that in the exercise of due diligence the 350,000 tons contained in the pillars and stumps would have been mined within six years from March 13, 1935, had not appellees ceased mining operations on the pooled properties and extended the operations into the newly acquired adjacent lease. This being true, appellants are entitled to the royalty of 3c per ton on the 350,000 tons, or $10,500. And since they have been, in effect, deprived of all their money during one-half of the six years after March 30, 1935, they are entitled to mean interest, or interest on the entire sum from March 30, 1938.

The absence of a minimum royalty provision from the contract militates in no way against appellants' right of recovery on account of appellees' failure to prosecute the mining operations with due diligence. A minimum

royalty provision is but a standard of diligence set up by the parties. Having failed to set up such a standard, the standard of due diligence set up by law becomes a part of the contract.

Nor is it any answer to say, as do the appellees, that appellants may not recover on an implied contract when they sued on an express contract. The recovery of the royalty on the unmined coal is a recovery on the express written contract. True, the obligation to mine with reasonable diligence is an implied obligation but such an implied obligation is as much a part of the contract as though it were plainly written therein. Warfield Natural Gas Co. v. Allen, 248 Ky. 646, 59 S. W. (2d) 534, 91 A. L. R. 890; 13 C. J. 558; 17 C. J. S., Contracts, section 328. Such an obligation, implied as a term of an express contract, becomes a part of the express contract and differs from an implied obligation imposed by law without regard to the assent of the party bound. It is in the latter class of implied contracts that there may be no recovery when the action is upon an express contract.

It is also contended by appellees that although appellants may be entitled to recover, the only recovery which can be had for failure to pay royalties when due is interest on past due payments. They say that since the coal is still there and royalty will be due when it is mined the only loss to appellants is the use of the money represented by due and unpaid royalties. Such a contention was made and rejected in Gilmore v. Ontario Iron Co., 86 N. Y. 455, and Freeport Sulphur Co. v. American Sulphur R. Co., supra. To sustain this contention might result in the indefinite postponement of the payment of royalties since appellees might continue to extend their operations to other properties. The lessor did not contract for an indefinite investment of his royalties at interest but for the royalties themselves. The recovery, therefore, should be for the royalties, not merely interest thereon.

Nor do we construe the final paragraph of the contract (quoted above) giving the lessees the right of free underground haulage for any coal "they may own beyond the lands of party of the first part" as giving the right of such haulage beyond the time of completion of mining operations on the pooled properties. Such a construction might well result in an indefinite postponement of completion of operations on the pooled proper-

ties since a part, at least, of the pillars and stumps must necessarily remain to keep the haulage route open. It is now settled in our jurisdiction that a lessee of coal rights has the right, during the time that he may under the lease mine coal on the leased premises, to use the underground passages for the removal of coal mined on other premises, Middleton v. Harlan-Wallins Coal Corporation, 252 Ky. 29, 66 S. W. (2d) 30, but this question was not free from doubt in the year 1920 when the contract in question was executed. We think it was the intention and purpose of the contract provision dealing with haulage to dispose of this doubt and confer such haulage rights as it is now settled would be conferred by law in the absence of the contract provision.

While the haulage right granted by the contract is somewhat ambiguous, we will not ascribe to the lessor an intent to confer on the lessees a privilege that might well result in indefinite postponement of completion of mining operations. It is our conclusion, therefore, that the right of hauling coal mined on adjacent property was conferred only during the period it was necessary to maintain the underground passages for the removal of coal mined on the leased property.

But such a conclusion does not establish appellants' right to compensation at the rate of 2c per ton for all coal mined on the adjacent lease since March 15, 1935. While appellees received, in addition to the royalty, 6c per ton from Southern Harlan on all coal mined on the adjacent lease, it is established that 2c was a reasonable haulage charge over the entire route through the pooled properties. Only nine per cent of this route was on the leased premises, consequently appellants are entitled only to this percentage of the money received for haulage. Further, appellants are not entitled to compensation for haulage during the six years subsequent to March 15, 1935, since appellees would have been entitled to free haulage during this period had the coal been mined. By the allowance of royalties we treat the situation, in effect, as if the mining had been done. It would therefore be inequitable to allow both royalties and haulage during the same period. Appellants, on this score, are entitled only to nine per cent. of the 2c per ton haulage paid appellees since March 15, 1941.

Reversed on the appeal and affirmed on the cross-

appeal with directions to enter a judgment in conformity with this opinion.

Whole Court sitting.