## BOND et al. v. JACKSON COUNTY COAL CO.

### No. 843.

United States District Court
E. D. Kentucky.

Aug. 7, 1952.

Clem F. Kelly, John M. Kelly, Lexington, Ky., for plaintiffs.

William A. Stanfill, Hazard, Ky., Bradley & Bradley, Georgetown, Ky., Charles Wylie, Lexington, Ky., for defendant.

FORD, Chief Judge.

The plaintiffs seek to recover amounts alleged to be due them from defendant on account of minimum royalties under a coal mining lease of October 3, 1938. Title to the lands embraced in the lease and all rights of the lessors thereunder were acquired by the plaintiffs on April 11, 1940.

The lease granted to the defendant the sole and exclusive right of mining and removing "all of the mineable and merchantable coal in, upon and under" a large

body of land, specifically described therein, lying on the waters tributary to Rock-castle River in Jackson County, Kentucky.

Provisions of the lease which appear pertinent in considering the questions presented are the following:

"All of the rights and privileges, and each and all of the covenants, agreements and conditions herein set out, shall continue and extend for a term of sufficient years as may be necessary for the mining and removal of all of the mineable and merchantable coal from said leasehold; and the second party hereby covenants, promises and agrees to pay to first party, its successors or assigns, fifteen cents (15¢) per ton for each and every ton of 2000 lbs. of coal, including every grade, mined and removed from mine tipples or storage on said leasehold, and for this purpose the said sum of 15 cents per ton shall be paid monthly on or about the 25th day of each calendar month for all coal so mined and removed from said coal tipples or storage on said premises in the calendar month next preceding, * * *.

"Second party further covenants and agrees to pay each year after one year from the date of the lease, during its use and occupancy of the leasehold, a minimum amount of not less than 15 cents per ton on 100,000 tons per year, beginning one year from the date of this lease, whether the actual tonnage produced in said year shall, at said 15 cents per ton, amount to said sum or not. But it is stipulated and agreed that in the event the coal produced and removed from said tipples and storage during any year, at 15 cents per ton, does not amount to as much as the minimum payment for said year, and that the amount of coal produced during the subsequent years at 15 cents per ton, amounts to more than the minimum payment, such excess of minimum payments over the coal actually produced shall be applied as a credit against excess coal produced above the minimum for such years as the coal produced at 15 cents per ton shall amount

to more than the minimum payment required hereunder; and provided further that in any period when the second party shall, through casualty, riots, strikes, market conditions, or acts of God, be prevented from producing coal, the payment of the minimum amount hereinabove provided shall be suspended during such time as second party is so prevented from producing, mining or removing coal from said leasehold; and there shall be no charge of any sort made above the actual 15 cents per ton of coal actually produced, mined and removed from said tipple and storage during such period as such conditions exist or continue. * * *

"And it is hereby stipulated and agreed that second party may not abandon or terminate said lease so long as merchantable and mineable coal may be produced therefrom at a profit; and for these purposes second party covenants and agrees to prosecute and pursue its mining operations upon said leasehold in such a way as to produce therefrom the greatest amount of merchantable and mineable coal, * * *."

The several grounds upon which the defendant seeks to avoid payment of the balance alleged to be due on account of annual minimum royalties may be briefly summarized as follows:

Defendant claims that N. U. Bond, Sr., agent for the lessor, went upon the land with defendant's president, M. K. Marlowe, and, after showing him several outcroppings and seams of coal which were of mineable quality and thickness, represented to him "that prospecting, already done, had disclosed that there was mineable and merchantable coal under the entire boundary" of 12,728 acres; that relying upon said representations, and by reason thereof, the defendant was induced to execute the contract but that mining operations on the leased premises disclosed "that there was not over 320 acres of such coal on the property"; that the provision set out in the contract for annual payment of a minimum royalty was based upon the mutual understanding of all parties, thereto, both plaintiffs and defendant, that there was sufficient

coal upon the leased property to make the mining of the minimum tonnage possible by skillful and customary methods; that the sole consideration moving from the plaintiffs to defendant for this provision of the lease was the presence on the property of that amount of mineable and merchantable coal; that "by reason of the absence of sufficient mineable and merchantable coal on the leased premises it was impossible, by skillful and customary methods, to obtain enough tonnage from said lease to comply with its terms as to minimum tonnage, or to obtain from said lease any larger tonnage per year than was actually mined and paid for"; and that "by reason of the aforesaid facts there was a total failure of consideration for defendant executing the clause in said lease calling for a minimum royalty * * *."

Defendant further claims that by their authorized agent N. U. Bond, Sr., the plaintiffs expressly waived and relinquished all claim to the minimum royalties which accrued in the year 1943 and thereafter, and, by their conduct in failing to demand payment of any of the accrued balances due for annual minimum royalties until June 10, 1949, the plaintiffs were guilty of such laches that they are equitably estopped and precluded from now recovering the claims herein asserted.

▆ The Court, without the intervention of a jury, heard the testimony introduced by the parties bearing upon the factual issues thus presented. The burden of proof concededly rested upon defendant. In compliance with Rule 52 of the Federal Rules of Civil Procedure, as amended, 28 U.S.C.A., the following findings of fact and conclusions of law express the views of the Court.

The defendant's claims that N. U. Bond, Sr., induced the execution of the lease by making representations to its president, M. K. Marlowe, to the effect that the entire boundary of land covered by the lease was underlaid with mineable and merchantable coal and that the consideration for the minimum royalty was an understanding on the part of both parties that the coal underlying the entire boundary was sufficient to enable the defendant to mine and produce at least 100,000 tons of coal per year, are not sustained by the preponderance of the evidence. The latter claim is in conflict with the words of the contract. The testimony of M. K. Marlowe, in reference to the negotiations with N. U. Bond, Sr., and as to the alleged representations is positively denied by Mr. Bond. Substantial support of his denial is found in the testimony of Ed Scrivner, with whom Mr. Marlowe appears to have carried on most of the negotiations in reference to the lease. It appears from the testimony that Mr. Marlowe had been a mine operator in the coal fields of Eastern Kentucky for more than forty years and for several years before the execution of the lease he had been engaged in mining upon lands adjacent to the lands covered by the lease. He went upon the property many times and was well acquainted with the hazards incident to carrying on operations in this field. Instead of relying upon representations by others he went upon the property and examined it for himself. He saw the outcroppings of coal and the mining conditions. He satisfied himself as to the prospects of his undertaking and sought to secure the execution of the lease.

There is no provision in the contract making the payment of minimum royalty conditional or in any wise dependent upon the ability of the defendant, as lessee, to mine and produce any particular amount of tonnage of coal each year. The provisions that the defendant should not abandon or terminate the lease so long as merchantable and mineable coal could be produced therefrom "at a profit" and that the minimum royalty should be paid by defendant "each year after one year from the date of the lease, during its use and occupancy of the lease hold" regardless of "whether the actual tonnage produced in said year shall, at 15 cents per ton, amount to said sum or not", are clear and unambiguous. Payment of the annual minimum royalties is thus made absolute and unconditional during defendant's occupancy of the premises unless abated or suspended for such time as defendant "shall, through casualty, riots, strikes, market conditions, or acts of God, be prevented from producing coal", none

of which conditions are shown to have existed during the period here in question.

Promptly after the execution of the contract the defendant took possession thereunder, provided adequate means and equipment for the operation and continued to engage in operating the enterprise contemplated in the agreement until about June 15, 1951, several months after the institution of this action. Defendant's operations resulted in the production of more than 100,000 tons of mineable and merchantable coal during each of the lease years 1940–41 and 1941–42, and for those years defendant paid royalties in excess of the minimum provided by the contract. The payments during those years in excess of the minimum, when credited to defendant, as the lease seems to intend, satisfies the balance due for minimum royalty for the prior year 1939–40, the first year minimum royalty was due under the contract. Beginning with the year 1942–43 to and including the year 1950–51 the defendant paid royalty at the rate of 15 cents per ton on the amount of coal produced, but such payments did not equal, in any year, the minimum royalty due for that year. The amounts of the annual deficits are not in dispute.

At the end of each month, the plaintiffs, by their engineer in charge of operations, rendered a statement to the defendant showing the tonnage of coal produced during the preceding month and the amount due on account thereof at the rate of 15 cents per ton, but never at any time rendered an account for the deficit due on account of minimum royalties and never made demand for the accrued balance until June 10, 1949.

In 1943, when the parties were involved in litigation in an effort to reduce taxes upon the property, representatives of both parties testified, in substance, that mineable and merchantable coal underlying the land was practically exhausted and operations could not be continued for more than a few years at the most.

At the time of this tax litigation in 1943 and at a later meeting in Winchester, Ky., the preponderance of the evidence shows that in conversations with representatives of the defendant regarding the discouraging appearances of their mining enterprise, N. U. Bond. Sr., stated that they should continue to do the best they could and need not worry too much about the minimum royalty. Such statements merely indicate the same attitude of leniency and forbearance toward the defendant which was also evidenced by his not pressing for annual payments of minimum royalties. The evidence falls far short of showing an intention to waive or relinquish plaintiffs' right to minimum royalties under the contract. It seems clear from the testimony that Mr. Bond was laboring under the mistaken idea that defendant would likely be unable to continue at a profit.

The uncontroverted testimony given by Benjamin Goldfarb, a certified public accountant, shows that the operations by the defendant under the contract here involved during each of the years 1946 to and including 1950, excepting only the year 1948, were not only profitable but were sufficiently profitable to have enabled defendant to have paid each year the full amount necessary to cover the minimum royalty provided by the contract and leave a substantial net profit. The defendant appears to be a family operated corporation. The net profits disclosed by Mr. Goldfarb's testimony were realized after payment of large salaries to various members of the Marlowe family. The unexplained failure of the defendant to produce its books and records showing the annual income realized from the enterprise justifies the inference, if it does not compel the conclusion, that such records would show that the operations were sufficiently profitable to have enabled the defendant to pay the full amount of the minimum royalties each year and still leave a substantial profit to the corporation.

Turning now to the questions of law, it is clear that the Court has jurisdiction of the parties and the subject matter. 28 U. S.C.A. § 1332.

Under the law of Kentucky, which is controlling in this case, the cardinal rule governing courts in the interpretation of mining contracts, as well as other contracts is to ascertain the intention of the parties, as disclosed by the words of the

contract considered in its entirety and not from something which the parties may have had in mind but which they did not express. Muncey Coal Mining Co. v. Muncey, 206 Ky. 638, 641, 268 S.W. 293.

██ Under the law of some jurisdictions, royalty payable under a mining lease is treated as the purchase price of the minerals in place; but, under the law of Kentucky, such royalty is regarded as "rent" for the manner and kind of occupation and use of the property which the contract allows. Caudill Coal Co. v. Solner Mining Co., 198 Ky. 243, 246, 248 S.W. 533. It is not unusual that a lease of land for coal mining purposes provides for a minimum royalty regardless of whether any coal is produced or not. Such a provision is valid. The minimum royalty is simply the consideration for the use of the property, and if the lessee retains possession of the leased premises for some purpose contemplated by the lease, the provision for minimum royalty is enforceable. Saylor v. Howard, 229 Ky. 826, 829, 18 S.W.2d 279; Gambill's Adm'r v. Ellser Coal Co., 230 Ky. 553, 20 S.W.2d 286.

██ Notwithstanding the proof that there was considerable diminution in the size of the seam of coal involved in this case, and despite the pessimistic views expressed by representatives of both parties to the effect that the coal would be exhausted long before the end of the period here involved, the fact remains that the coal never became exhausted but was mined and marketed by the defendant at a substantial profit throughout the entire period here in question. Where the primary purpose of a coal mining lease is to provide for the recovery of the mineral, the provisions of the lease are construed with that purpose in mind and, in the absence of clear language to the contrary, the parties will not be held to have intended that mining operations shall continue after it is established that mineable and merchantable coal was not found on the leased property or had been exhausted or dwindled to such an extent that it no longer was mineable at a profit, Auxier Coal Co. v. Big Sandy & Millers' Creek Coal Co., 194 Ky. 14, 238 S.W. 189, but it is quite clear that the facts established do not bring this case within the shelter of that rule and it affords no ground for relieving the defendant from the clear and unambiguous provision of the contract requiring payment of the minimum royalty during the time it occupied the premises. Laurence E. Tierney Land Co. v. Kingston-Pocahontas Coal Co., 241 Ky. 101, 43 S.W.2d 517.

██ Since, by the terms of the lease, the defendant was expressly precluded from discontinuing the prosecution of the mining operations contemplated by the agreement so long as merchantable and mineable coal could be produced from the premises, at a profit, its continuance of such operations as are shown here did not constitute a valid consideration for the alleged waiver of minimum royalties, Niles v. Meade, 189 Ky. 243, 249, 224 S.W. 854, nor do the facts disclose the essential elements of estoppel or laches, for it does not appear from the proof that defendant suffered loss or other prejudice by reason of plaintiffs' failure to demand an annual accounting for the accrued royalties. Maryland Casualty Co. v. Dickerson, 213 Ky. 305, 307, 280 S.W. 1106; Wisdom's Adm'r v. Sims, 284 Ky. 258, 265, 144 S.W.2d 232.

The evidence is convincing that the officers of defendant deliberately and with full understanding and appreciation of the obligations and uncertainties involved, bound the defendant to a contract of chance. They cannot justly complain because the result was less favorable than they hoped or may have had reason to anticipate. Lehigh Zinc & Iron Co. v. Bamford, 150 U.S. 665, 14 S.Ct. 219, 37 L.Ed. 1215.

The plaintiffs are entitled to recover the balance due on account of minimum royalty for the year 1942–43, $2,419.57; for the year 1943–44 $7,060.18; for the year 1944–45 $9,336.60; for the year 1945–46 $9,794.58; for the year 1946–47 $8,708.56; for the year 1947–48 $9,442.50; for the year 1948–49 $11,157.91; for the year 1949–50 $8,466.30, and for the year 1950–51 $11,059.07, amounting to the total sum of $77,445.27, with interest from the date hereof, and the costs herein.

Judgment should be entered accordingly.