William G. HALL et al., Appellants,

v.

Verna Noe LANDRUM et al., Appellees.

Court of Appeals of Kentucky.

May 7, 1971.

Rehearing Denied Oct. 15, 1971.

G. E. Reams, Harlan, for appellants.

James S. Greene, Jr., Greene & Forester, Harlan, for appellees.

DAVIS, Commissioner.

Appellees, who were defendants in the trial court, obtained judgment for $9,125.55 on their counterclaim in an action concerning a coal-mining lease. The appellants, who were plaintiffs in the trial court, attack that portion of the judgment affording the monetary award to the appellees.

The lease in question was made on June 27, 1917. The appellants are successors in interest of the original lessees. The appellees are successors in interest to the original lessors. For convenience the parties will be designated as lessors and lessees.

The lease covered a tract of approximately 175 acres, designated as the Noe tract. That tract was one of the tracts referred to as "the pooled properties" in Cawood v. Hall Land & Mining Company, 293 Ky. 23, 168 S.W.2d 366, but the issues on this appeal and the lease under consideration vary in pertinent details from those which obtained in the Cawood case.

Some of the pertinent provisions of the lease of the Noe tract are:

"Second: The lease shall take effect as of this date [June 27, 1917] and shall continue in force and effect for a period of thirty-five years from and after this date and until all of the coal product described in this lease is mined out, upon the terms hereinafter set forth."

The third and fourth paragraphs of the lease provided for payment of royalty to the lessors at the rate of ten cents per ton, with an annual minimum royalty of $1200 with certain details as to dates of payments.

The fifth paragraph of the lease required the lessees, within a specified time, to:

" * * * commence the development of a coal mine or coal mines on or near the leased premises and the construction and erection of a suitable and convenient * * * mining plant with all necessary and complete equipment to be installed for the purpose on or adjacent to the leased property so as to enable the lessees to conduct and carry on on the said leased premises and the adjacent property a coal mine with at least a daily capacity or output of 500 tons per day and that they will diligently prosecute said work until the same is completed."

The fifteenth paragraph of the lease recited:

"The free right is hereby granted by the lessors unto the lessees to use the entries, air ways and all appurtenances and the appliances placed on the lessors' property for the purpose of working the coal from the adjoining properties but it is expressly agreed that all of the coal of the lessors except that necessary to be left in pillars and stumps on that part of the leased premises necessary to be

used for the purpose of working coal from adjoining properties shall first be worked in preference to the adjoining property. When eighty (80) per cent of all the workable coal in the land herein leased has been mined and removed therefrom, the minimum royalty heretofore named shall be suspended and thereafter royalty paid on coal actually mined."

The original lessees proceeded to mine coal from the Noe tract and adjoining tracts, paying the prescribed royalty. In 1925 the lessees assigned the mining rights acquired by the Noe lease to Southern Harlan Coal Corporation, which company conducted the mining activities and paid royalties directly to the lessors. Southern Harlan terminated its operations on June 30, 1952, but the lessees then transferred the rights under the Noe lease, and other leases, to Imperial Harlan Coals, Inc. The latter company terminated its activities on April 29, 1961.

From the inception of the Noe lease through 1932, the lessees and Southern Harlan mined and paid royalties on 475,570 tons of coal obtained from the Noe tract. By January 1, 1933, more than 80% of the mineable and merchantable coal had been extracted from the Noe property. After that date payment of minimum royalty was discontinued, but royalty of ten cents per ton of coal actually mined was paid to and accepted by the lessors. From 1933 through 1944, Southern Harlan mined and paid the stated royalty on only 45,823.89 tons of coal from the Noe tract. Southern mined no coal from the tract after 1944. When Imperial Harlan assumed the mining operations in 1952, it used the Noe tract for the primary purpose of transporting through underground passageways on the Noe tract coal which had been mined from other boundaries. However, by "robbing" the pillars and stumps which remained in the Noe tract, Imperial mined and paid royalty to lessors on 30,744.58 tons of coal from 1953 through 1956, the last time any coal was mined from the Noe tract.

There is no evidence in the large transcript to indicate that any of the lessors complained to the lessees or to Southern Harlan or Imperial Harlan concerning the nonpayment of minimum royalty, the failure to surrender possession of the tract, or of lack of diligence in exploiting coal from the Noe tract until the lessees sought to effect an agreed termination of mutual rights and obligations under the lease in 1963. By letter dated September 20, 1963, lessors' attorney notified lessees, in response to lessees' letter seeking agreed mutual release, that lessors contended that less than 83.6% of the mineable coal had been taken and suit would be filed for recovery of "a substantial sum" and declaration of rights. When no such suit was filed, the lessees filed the present declaratory judgment action on November 23, 1965.

In their original answer and counterclaim, the lessors sought recovery of unpaid minimum royalties alleged to have accrued within the fifteen-year period before filing the counterclaim, on the theory that the lease contract was in effect and that less than 80% of the merchantable coal had been mined. Subsequently, the lessors amended their counterclaim and admitted that more than 80% of the workable and mineable coal had been extracted as of January 1, 1933. Lessors further asserted that *all* of the workable coal had been exploited from the pooled tracts as of June 30, 1952, the date Southern Harlan ceased its operations. Lessors asserted that lessees had wrongfully retained possession of the Noe tract mineral rights for their own purposes, thereby incurring liability by way of rental at the rate of $1200 per year, to be credited by the $3,074.45 royalty actually paid to lessors subsequent to 1952.

An alternative basis of recovery was asserted in the amended counterclaim, seeking recovery of a wheelage charge at six cents per ton for 325,831.10 tons of coal allegedly hauled through the passageways on the Noe tract from other tracts.

The lessors presented no evidence concerning the reasonable rental value of the

Noe tract, nor did they offer proof to establish the reasonable wheelage charge used as basis for their alternative counterclaim. The trial court found as fact, however, that a reasonable annual rental for continued possession of the Noe tract was $1200, a sum equal to the annual minimum royalty mentioned in the lease.

The lessors contend that the rationale of Cawood v. Hall Land & Mining Company, 293 Ky. 23, 168 S.W.2d 366; Gambill's Adm'r v. Ellser Coal Company, 230 Ky. 553, 20 S.W.2d 286; and cases of like import supports the judgment. Those decisions stand for the proposition that a coal lessee is obligated to use reasonable diligence in mining coal from the leased premises and that the right to use passageways on the leased premises for transporting coal mined from other boundaries ceases when the term of the original lease is completed. If a coal lessee retains the leased property for his own purposes after the lease has expired, either by its own terms as to years, or earlier by completion of the mining, the lessee owes rental to the lessors. The amount of the minimum royalty may be used as the measure of rental in some circumstances. See Saylor v. Howard, 229 Ky. 826, 18 S.W.2d 279, and Bond v. Jackson County Coal Company, D.C.E.D.Ky., 106 F.Supp. 247. The circumstances of this case, however, are significantly different from those obtaining in the cited cases.

In Middleton v. Harlan-Wallins Coal Corporation, 252 Ky. 29, 66 S.W.2d 30, it was held that the correct rule is that " * * as to subterranean passages and openings made by the extraction of mineral by its owner, or lessee of the right to mine it, the owner or lessee has the right, in the absence of contract restrictions, to use such openings in the transportation of mineral taken from other adjoining or adjacent mining operations without infringing upon any right of the surface owner or committing any trespass to or on his property." Id. 66 S.W.2d at page 30. In approving that rule the court discussed the varying theories upon which other courts had embraced

it, concluding that the right to so use the passageways exists only so long as any of the immediate mineral remains in place and it is necessary to maintain the passageways to extract and remove the mineral under the particular surface. Under the rule as so stated, the present lessees had the right to use the passageways on the Noe tract to transport coal extracted from other boundaries so long as coal remained to be extracted from the Noe boundary and the passageways were necessary for its removal, even without any contractual provision.

It seems clear that the lessors and lessees contemplated that not *all* of the coal under the Noe tract would be mined forthwith. This is so, because the lease expressly suspended payment of minimum royalties when 80% of the product had been extracted. More significantly, the quoted fifteenth paragraph of the lease, which fixed 80% exploitation as the cut-off for minimum royalty, expressly granted to lessees the right to use the Noe passageways for transporting coal mined on adjoining properties. That privilege was coupled with lessees' covenant "that all of the coal of the lessors except that necessary to be left in pillars and stumps on that part of the leased premises necessary to be used for the purpose of working coal from adjoining properties shall first be worked in preference to the adjoining property."

It appears that the procedure contemplated by the lessors and lessees was that lessees would pool the Noe tract with others in order to form a commercially feasible enterprise. In so doing, the lessees bound themselves to "give preference" to extracting the Noe minerals, save only to the extent that the required pillars and stumps for passageways were not to be mined, so long as the passageways were required. For these reasons, the rule as announced in *Cawood* and *Middleton*, cited above, does not govern this case, because there were contractual provisions enlarging the passageway rights.

The conduct of the parties, as a matter of contemporaneous construction, buttresses the views expressed. From 1933 to 1963 the lessors made no complaint that annual minimum royalties had not been paid. Despite the fact that the original lease, made June 27, 1917, spoke of a term of thirty-five years "and until all of the coal product described in this lease is mined out," the lessors accepted royalty payments calculated on the lease's term of ten cents per ton, for coal mined as late as 1956. As late as 1963 the lessors asserted that the lease was in force and demanded that further mining be done. Lessors, at that time, and even after this suit was filed, took the position that 80% of the workable coal had not been mined, despite their failure to complain of the lapse of thirty years in payment of minimum royalties.

The court concludes that the lessees had the right under the lease to retain possession as they did and to use the passageways as permitted by the lease. It follows that the judgment is erroneous to the extent that it permits monetary recovery against the lessees. In all other respects the judgment is proper and no complaint is made of it. Even if there were doubt about the construction given the lease as affected by the conduct of the parties, the monetary recovery could not be upheld because of the absence of evidence to support the sum awarded.

Lessors contend that the lease itself furnished ample evidence of the reasonable rental value of the Noe tract. Since the lease specified a minimum annual royalty of $1200, it follows, reason the lessors, that such a sum is indeed the agreed reasonable rental value. In support of that position the lessors rely upon Gambill's Adm'r v. Ellser Coal Company, 230 Ky. 553, 20 S.W.2d 286, calling particular attention to the following excerpt from the opinion in that case:

"The rule on the subject seems to be that, even where the coal is exhausted, the lessee is not released from liability for the fixed rental or royalty based on minimum production if he retains possession of the premises for some purpose under the lease [citing] although the purpose for which it is retained is not a mining purpose [citing]." Id. 20 S.W.2d at page 287.

That principle of law is not questioned. But, it has no application here because the lease itself prescribed that there should be *no* minimum royalty after 80% of the coal had been mined. The lease envisioned that the lessees were to retain possession and use the passageways for transporting coal mined from adjacent boundaries, without payment of minimum royalty *if* 80% of the coal product had been captured. Hence, the rationale of Gambill's Adm'r v. Ellser Coal Company, supra, has no application.

The conclusions reached make it unnecessary to discuss other claimed grounds for reversal which lessees have asserted.

The judgment is reversed with directions to enter a new judgment in conformity with the opinion.

MILLIKEN, C. J., and EDWARD P. HILL, Jr., OSBORNE, PALMORE, REED and STEINFELD, JJ., concur.