RENDERED: AUGUST 4, 2023; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-0095-MR

CYPRESS FLATS LAND COMPANY, LLC;
NEAL GREENWELL FARMLAND, LLC;
GREGORY BERNARD GREENWELL,
AND HIS WIFE, CAMILLE ELIZABETH GREENWELL;
THE ESTATE OF BERNARD GERALD GREENWELL,
BY AND THROUGH ITS EXECUTRIX,
MARILYN GREENWELL;
MARILYN SUE GREENWELL;
ROBERT JOSEPH ELDER;
KEITH BENTON ELDER;
THOMAS DAMIEN ELDER, JR.;
UC RUDD FARMS, LLC;
ROBERT ELMORE MILLS, AND HIS WIFE,
CAROLYN B. MILLS;
BRYAN KEITH HENDRICKSON,
AND HIS WIFE, BETH HENDRICKSON;
JAMES D. HENDRICKSON, AND HIS WIFE,
ANN HENDRICKSON;
JERALD A. THOMPSON, AND HIS WIFE,
KATHLEEN THOMPSON;
THOMPSON FARMS 4, LLC;
PATRICK FRENCH, AND HIS WIFE,
TERESA FRENCH;
THOMAS LAND HOLDINGS, L.P.;
TRAVIS FARMS, INC.;
ROBERT J. ELDER IRREVOCABLE LIVING TRUST;
DEBRA ELDER;
GREENWELL BROTHERS FARM;
MC ELDERS, LLC; AND
THOMAS FAMILY LAND, LLC                                    APPELLANTS

APPEAL FROM UNION CIRCUIT COURT
v.       HONORABLE C. RENE' WILLIAMS, JUDGE
ACTION NO. 15-CI-00212


RIVER VIEW COAL, LLC                            APPELLEE


AND


NO. 2022-CA-0145-MR


RIVER VIEW COAL, LLC                        CROSS-APPELLANT


APPEAL FROM UNION CIRCUIT COURT
v.       HONORABLE C. RENE' WILLIAMS, JUDGE
ACTION NO. 15-CI-00212


CYPRESS FLATS LAND COMPANY, LLC;
NEAL GREENWELL FARMLAND, LLC;
GREGORY BERNARD GREENWELL,
AND HIS WIFE, CAMILLE ELIZABETH GREENWELL;
THE ESTATE OF BERNARD GERALD GREENWELL,
BY AND THROUGH ITS EXECUTRIX,
MARILYN GREENWELL;
MARILYN SUE GREENWELL;
ROBERT JOSEPH ELDER;
KEITH BENTON ELDER;
THOMAS DAMIEN ELDER, JR.;
UC RUDD FARMS, LLC;
ROBERT ELMORE MILLS, AND HIS WIFE,
CAROLYN B. MILLS;
BRYAN KEITH HENDRICKSON,
AND HIS WIFE, BETH HENDRICKSON;

JAMES D. HENDRICKSON, AND HIS WIFE,
ANN HENDRICKSON;
JERALD A. THOMPSON, AND HIS WIFE,
KATHLEEN THOMPSON;
THOMPSON FARMS 4, LLC;
PATRICK FRENCH, AND HIS WIFE,
TERESA FRENCH;
THOMAS LAND HOLDINGS, L.P.;
TRAVIS FARMS, INC.;
ROBERT J. ELDER IRREVOCABLE LIVING TRUST;
DEBRA ELDER;
GREENWELL BROTHERS FARM;
MC ELDERS, LLC; AND
THOMAS FAMILY LAND, LLC                          CROSS-APPELLEES


OPINION AND ORDER
AFFIRMING IN 2022-CA-0095-MR
AND
DISMISSING IN 2022-CA-0145-MR

** ** ** ** **

BEFORE:  CALDWELL, DIXON, AND ECKERLE, JUDGES.

ECKERLE, JUDGE:  A Union County jury found in favor of a mine lessee's right to use voids and tunnels underlying certain surface properties for all lawful purposes, including the storage of coal waste, even when the particular areas had been regulatorily abandoned for many decades.  The Trial Court entered a judgment in conformity with the jury's verdict.  The Appellants/Cross-Appellees appeal this judgment in No. 2022-CA-0095-MR.  The Appellee/Cross-Appellant filed a protective cross appeal in No. 2022-CA-0145-MR.  In No. 2022-CA-0095-

MR, we affirm the judgment, finding no reversible error occurred. We dismiss the cross-appeal, No. 2022-CA-0145-MR, as moot.

## BACKGROUND

At dispute here is a coal lessee's use of underground mining tunnels and voids in a long-established coal mining operation. The dispute largely centers on two issues: first, does mining inactivity nullify the mineral (specifically, coal) owner or lessee's right to use the tunnels and voids; second, if inactivity does not nullify the right to use the tunnels and voids, can a mining owner or lessee perform all lawful mining activities, including permitted disposal of coal waste, in those tunnels and voids? We hold that longstanding Kentucky law answers these questions no and yes, respectively.

The Appellants/Cross-Appellees (hereinafter, the "Surface Owners") are various parties who possess surface interests in real property overlying portions of the larger boundary of three coal seams, which we will refer to as the Number 11, Number 9, and Number 7 seams.[1] The mineral rights to the coal underlying these surface estates were severed and conveyed to other parties (hereinafter, "Coal Estate Owners") many decades prior. The Coal Estate Owners are not parties to this appeal and were never parties below.

---

[1] The greater the seam number, the closer the seam is to the surface.

The Coal Estate Owners entered into leases with various parties over the decades to mine the coal. Those prior lessees mined portions of the Number 11 and Number 9 seams, variously ceasing and/or pausing operations in the 1970s and 1990s. Thus, in some places there has been no mining activity for multiple decades. River View Coal, LLC (hereinafter, "River View"), the instant Appellee/Cross-Appellant, is the current lessee, having formed in 2005 and acquired the rights to mine for coal in the Number 11, 9, and 7 seams. Its mining operations began in 2009.

Prior to River View's lease, the Number 11 and Number 9 seams had first-pass mining performed in many, if not all, locations underlying the Surface Owners' properties. This first-pass mining used the room-and-pillar method that leaves coal supporting the ceilings of hollowed-out rooms or voids from where the coal has been removed. Many of those rooms or voids in the Number 11 and 9 mines have been sealed and placed in abandoned status, and there also remain tunnels called "mains" and "sub-mains" through which people, equipment, coal, and coal refuse may travel.

The Number 7 seam is "virgin" coal, meaning it has never been mined. River View's studies of it show that the coal is of good quality and mineable without too much difficulty. The seam is approximately five-feet thick and many miles long. It is estimated that it could be mined for 30 years or more.

The Number 7 seam could be reached through the tunnels already created in the Number 11 and 9 seams. Mining the Number 7 seam through these openings would not interrupt River View's other mining operations. Moreover, using these mining works through the already-mined seams is cost-efficient, as the coal could be transported along existing belts and arrive at River View's production plant.

Prior to signing its lease, River View conducted a thorough title search and believed the Coal Estate Owners had valid title to the coal. Nothing in the title search revealed any third-party claims to the coal estate or the tunnels and voids made from previous mining activities.

River View's lease with the Coal Estate Owners included numerous rights, including the right to inject coal slurry into mine voids. Coal slurry is a byproduct of cleaning the mined coal; it is typically stored by the mining operator. As a measure of redundancy, River View has multiple ways of storing the coal slurry. Two principal methods are surface impoundments and injection into mine voids. Redundancy allows River View to continue to operate year-round, as pipes on the surface can freeze in the winter necessitating an alternative method for slurry storage. The surface impoundment is exactly as it sounds, a large surface basin into which the slurry is pumped through pipes. Injection into the mine voids, as its name implies, is a similar process whereby pipes transport coal slurry into mined-out voids that have been sealed off from tunnels and other mining works. In

the latter process, the water is typically decanted or removed after the solids in the slurry have settled.

To utilize either the surface or the voids for coal slurry, River View must go through an exhaustive permitting process with multiple governmental agencies, a process that requires ample notice given to the community and the Surface Owners before a permit is approved. Throughout its application process to inject coal slurry into mine voids, no objectors materialized.

To obtain the mining lease, including the aforementioned rights to deposit coal slurry in the existing voids, River View paid the Coal Estate Owners more than $1,000,000.00 in royalties. River View continues to pay hundreds of thousands of dollars in annual royalties to the Coal Estate Owners. River View also pays taxes on the coal estate. Additionally, River View paid millions of dollars to the prior lessee to obtain valuable equipment and various interests and permits for the larger mining operation. River View's mining operation is large and exceeds the boundaries of the Surface Owners; it is an operation worth more than $400 million dollars.

River View never paid any Surface Owners for the use of the underground mining works. However, it did pay for surface easements relating to the coal slurry injection. Years before the Surface Owners filed the instant Complaint, River View met with and negotiated and executed easement

agreements with some of the Surface Owners to install and operate slurry pipelines, decant wells, and slurry injection wells on the surface properties. River View paid hundreds of thousands of dollars for those easements. Through 2016 River View operated the slurry injection operation into the mine voids in portions of the Number 11 seam before discontinuing the operation due to cost challenges.

In February of 2015, counsel for the Surface Owners mailed a letter to counsel for River View claiming ownership of the mine voids and demanding compensation for the same. The Surface Owners believed they were due payments as another mining operation, Peabody Coal Company, had made payments to certain surface owners for underground coal slurry injection that it had done. River View proffers that Peabody Coal Company made these payments because it had been acting without a valid permit. Regardless, River View disclaimed that it owed the Surface Owners any compensation for its use of the mine voids and tunnels, retained counsel, and defended itself against the ensuing lawsuit.

Following the filing of the Complaint, the parties engaged in extensive litigation over almost a half-decade. The Surface Owners believed that they had at some point obtained a property interest or at the very least a usage interest in the voids underlying their properties, and that River View had trespassed by using the mining voids and tunnels for its coal slurry deposits. The Surface

Owners never claimed trespass or damage to their surface properties. And the Surface Owners never joined the Coal Estate Owners as parties.

The case ultimately proceeded to a trial that spanned almost a month, following which the jury rendered a verdict in favor of River View on the threshold issue of whether River View had a right to use the mine voids and tunnels. The Trial Court entered a judgment accordingly. This appeal was then prosecuted, and we now turn to the issues raised by the Surface Owners.

## ANALYSIS

Before addressing the merits of the underlying appeal, we initially note the poor state of briefing in this case, especially by the Surface Owners. Believing a case with this much underlying litigation warranted lengthy briefs, the parties requested the right to file briefs totaling up to and including 160 pages, well in excess of our then-existing page limitations.[2] Indeed, the record in this case is voluminous, consisting of four bankers' boxes of documents and including 2,656 pages of certified record and 14 DVDs of video-recorded proceedings, including the almost four weeks of trial testimony. This Court granted the motion and expected to receive briefs that, while lengthy, comported with our Rules and clearly pinpointed the salient portions of the record.

---

[2] The Kentucky Rules of Appellate Procedure ("RAP") were not yet effective when briefing occurred in this case.

The Surface Owners then filed an Appellant's Brief that contains a paucity of compliance with our then-existing briefing requirements. For example, CR[3] 76.12(4)(c)(v), the appellate briefing rule in place when the parties filed their briefs in the instant case, provides that an appellant's brief shall contain:

> (v) An "ARGUMENT" conforming to the statement of Points and Authorities, with ample supportive references to the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner.[4]

The Surface Owners' Appellant's Brief contained exactly *zero* preservation statements in their Argument section. Their Argument section also substantially failed to provide ample supportive references to the record. Their seminal and threshold issue – the right to use the mine voids – contained just four footnotes with citations to the record, notably citing to a total of 49 *seconds* of trial testimony from a multi-week trial. Though their statement of the case was lengthy and contained multiple references to the record, the Rules nonetheless require

---

[3] Kentucky Rules of Civil Procedure.

[4] The Kentucky Rules of Appellate Procedure now control briefing requirements. RAP 32(A)(4) is substantially similar to the rule it replaces:

> (4) An **argument** conforming to the statement of points and authorities, with ample references to the specific location in the record and citations of authority pertinent to each issue of law and which shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner.

briefs to include ample, supportive references to the record in the Argument section showing the manner in which the facts pertain to each issue of law. Additionally, we note that River View's Appellee/Cross-Appellant's Brief contained no preservation statements at the beginning of any of its protective cross-appeal arguments.

Continuing, CR 76.12(4)(c)(iii) required a statement of points and authorities that must:

> . . . set forth, succinctly *and in the order in which they are discussed in the body of the argument*, the appellant's contentions with respect to each issue of law relied upon for a reversal, *listing under each the authorities cited on that point* and the respective pages of the brief on which the argument appears and on which the authorities are cited.

(Emphasis added.)

The Surface Owners' Appellant's Brief has a statement of points and authorities that substantially fails to conform with CR 76.12(4)(c)(iii). It completely fails to set forth even a single contention or provide any references to the location of legal issues in its 44-page brief. Likewise, the list of authorities is alphabetical and not grouped in such a way as to provide any clarity about which citation supports which legal issue raised.

For these briefing errors, we could impose penalties. CR 76.12(8)(a) ("A brief may be stricken for failure to comply with any substantial requirement of

-11-

this Rule 76.12."). For example, "[i]f a party fails to inform the appellate court of where in the record his issue is preserved, the appellate court can treat that issue as unpreserved." *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021). However, if the errors are only "to the formatting rules[,]" then a "review for manifest injustice is an inappropriate sanction[.]" *Id.*

The instant case has both preservation and formatting errors. While we elect to not impose penalties in the instant case, we admonish counsel in the future to comply fully with our briefing requirements, as future panels of this Court may elect to impose penalties for failures to comply with substantial briefing requirements.

We now turn to the Surface Owners' appellate issues.

### A. Did the Trial Court err by denying Appellants' motion for directed verdict?

The Surface Owners claim the Trial Court erred by denying their motion for a directed verdict. River View claims in response that the Trial Court committed no error that warrants overturning the jury verdict on this issue. Alternatively, and pursuant to a protective cross-appeal, River View argues that the Trial Court should have either directed a verdict or granted summary judgment in River View's favor. River View requests that if we reach the merits of its protective cross-appeal that we adopt the "container-space" rule that allows, upon severance of the mineral estate, for the mineral estate owner to become the

-12-

absolute owner of the coal and the space containing the coal. River View also argues that any reversionary interest the Surface Owners have or had is invalid pursuant to KRS[5] 381.221. Finally, River View claims the Surface Owners lacked standing to bring the instant claim.[6]

   i.   *Standard of review.*

We begin with the Surface Owners' directed verdict claim. As an appellate court reviewing evidence supporting a judgment entered upon a jury verdict, our role "is limited to determining whether the trial court erred in failing to grant the motion for a directed verdict." *Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky. 1998) (citing *NCAA v. Hornung*, 754 S.W.2d 855 (Ky. 1988)). We cannot determine the credibility or weight that should be given to the evidence, and "[a]ll evidence which favors the prevailing party must be taken as true[.]" *Id.* Additionally, the prevailing party is entitled to all reasonable inferences that may be drawn from the evidence. *Id.*

---

[5] Kentucky Revised Statutes.

[6] Constitutional standing may be raised at any level, including on appeal. The three elements a plaintiff must allege for constitutional standing are: (1) an injury; (2) caused by the defendant; and (3) of the sort that the court is able to redress. *Commonwealth Cabinet for Health and Family Services, Department for Medicaid Services v. Sexton by and through Appalachian Regional Healthcare, Inc.*, 566 S.W.3d 185, 196 (Ky. 2018). Because the Surface Owners raised a colorable claim pursuant to *Middleton v. Harlan-Wallins Coal Corporation*, 252 Ky. 29, 66 S.W.2d 30 (1933), we find that the Surface Owners had constitutional standing.

When the evidence is conflicting, "it is the responsibility of the jury to determine and resolve such conflicts, as well as matters affecting the credibility of witnesses." *Id.* at 19 (citing *Taylor v. Kennedy*, 700 S.W.2d 415 (Ky. App. 1985)). Directed verdicts are generally not entered by trial judges "unless there is a complete absence of proof on a material issue or if no disputed issues of fact exist upon which reasonable minds could differ." *Id.* at 18-19. *See also Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2014). "Upon completion of such an evidentiary review, the appellate court must determine whether the verdict rendered is palpably or flagrantly against the evidence so as to indicate that it was reached as the result of passion or prejudice." *Bierman*, 967 S.W.2d at 18.

ii.    *Law regarding sub-surface uses in coal estates.*

With these standards in mind, we next analyze the law underlying the directed verdict claim. The Surface Owners variously claim that they either own the voids or have some possessory or controlling interest in the use of the mining voids because, they argue, the mines are not being actively mined and/or the mines have been abandoned by River View.

The principal case relied upon is *Middleton v. Harlan-Wallins Coal Corporation*, 252 Ky. 29, 66 S.W.2d 30 (1933). There, a similar sub-surface usage dispute arose between a surface owner and a sub-surface coal owner. 66 S.W.2d at 30. The coal owner possessed title to the coal under a large boundary of surface

properties, and Green B. Middleton owned one of those surface properties. *Id.*
The coal owner extracted coal under Middleton's land, and, in so doing, created
tunnels, some of which were "made by extracting coal." *Id.* Later, while
extracting coal outside of Middleton's surface boundaries, the mineral owner used
tunnels under Middleton's surface boundaries to transport the foreign coal. *Id.*
Middleton sued the mineral owner for trespass and sought an injunction; the Trial
Court dismissed the complaint. *Id.*

On appeal, the Court framed the question before it as, "What is the
character of ownership and the extent of the rights of an owner of mineral in place
in and to the necessary and incidental underground vacuums, openings and
passages that are made by removing the mineral and others which may be
necessary to be made for that purpose?" *Id.* The answer to this question is
arguably of seminal importance in the case *sub judice*, as the Surface Owners on
appeal here state that the "crux before this Court is identical to the question
answered in the *Middleton* decision." Appellant's Brief at 25. Thus, a detailed
recitation of *Middleton*'s holding and reasoning is appropriate.

The *Middleton* Court examined multiple jurisdictions and determined
the majority rule of the United States and England to be that the mineral owner has
a right "to so employ such subterranean openings in moving mineral from other
mines or portions of the same mine, though located under the surface of a different

-15-

surface owner[.]" 66 S.W.2d at 31 (citations omitted). A review of more than a dozen cases showed that "apparently all of the courts of this country and England[, except one,] uphold the right of the owner to so employ such subterranean openings in moving mineral from other mines or portions of the same mine, though located under the surface of a different surface owner[.]" *Id.* at 30-31. This rule was derived from three different theories.

Under the first theory, one who purchases or obtains the right to market the mineral in place likewise purchases or obtains the right in the soil in which the minerals are embodied and becomes the owner of such encasement the same as he does of the minerals enclosed there. *Id.* at 31.

Under the second theory, "so long as there is any of the immediate mineral in place, the owner of it, or the one who has the right to extract it, may use the tunnels and other necessary subterranean passages and openings, not only for the removal of the mineral taken therefrom and embedded under the same surface rights, but also for all other lawful purposes so long as it is necessary to maintain such openings to extract and remove the mineral under the particular surface[.]" *Id.*

Under the third theory, if an absolute owner of land possesses title to the skies above its surface and to the center of the earth below it, that owner may divide his title perpendicularly into longitudinal strata and sell those sub-surface

strata as mineral rights, giving the purchaser of the mineral rights an absolute title to the space occupied by the minerals purchased by him. *Id.* The *Middleton* Court held that under any of these three theories the mineral owner prevailed.

The Court reasoned that while a mineral owner may not use the surface to clean or market minerals taken from adjoining lands, there is a "marked difference" between using the tunnels and mine voids versus using the surface to transport foreign minerals because when using the mine voids "*no right of the owner of the surface is interfered with in the slightest degree.*" *Id.* (emphasis added). Importantly, the Court noted that the surface owner "has no occasion to use any such subterranean tunnels in exercising any of his reserved surface rights and privileges." *Id.* Only if the surface owner had its surface rights burdened "with the refuse from such foreign mined material" might there be some potential action against the use of the mine voids. *Id.*

However, in *Middleton* there were no allegations of such surface burden, thus if the Court adopted any of the three aforementioned reasons underlying the majority rule, the mineral owner would have the right to use the underground passages for foreign material. That Court found that the second theory was "logical, reasonable, and in accord with sound principles," and it

declined to express any opinion about the first or third theories.[7]  *Id.*  Accordingly,

the Court affirmed a judgment dismissing the complaint of trespass.  *Id.* at 32.

Importantly, the *Middleton* Court expressly disclaimed that the

surface owner had a possessory interest or usage rights in the tunnels, openings,

and mine voids.  The Court noted the surface owner "has *no* occasion to use any

such subterranean tunnels in exercising any of his reserved surface rights and

privileges."  *Id.* at 31 (emphasis added).  The question was not whether the mine

voids reverted to the surface owner; instead, the question concerned only the rights

of the mineral owner to use the mine voids to transport foreign material absent an

express contractual agreement.

Despite the unequivocal conclusion in *Middleton* in favor of the

mineral rights owners and lessees to use the tunnels and voids for all lawful

purposes so long as any mineral remained and the tunnels could be used to access

those minerals, the Surface Owners argue that two phrases in the *Middleton*

decision negate those rights.  First, they argue that "so long as it is necessary to

maintain such openings to extract and remove the mineral under the particular

---

[7] We note that a previous Kentucky case appears to offer support for theory three, though it does not appear the *Middleton* Court considered it.  *See McPherson v. Thompson*, 203 Ky. 35, 261 S.W. 853, 854 (1924) ("The courts generally hold that, where a severance of estates has taken place and the surface is owned by one person and the minerals by another, both estates are regarded as land susceptible of sale and conveyance, or descent in the ordinary way to the same extent and in the same way that they would be if they were entirely separate and distinct tracts of land, severed perpendicularly instead of horizontally.").

surface" is a clause that should be read to restrict the mineral owner's lawful uses. Second, they argue that the word "immediate" in the phrase "in extracting the immediate mineral" should be read as an active and current duty that permits abandonment of the use of mining works if a lessee does not with due diligence extract the minerals.[8] We find no support for either interpretation, and we begin with the "immediate" argument first.

### 1. *Extraction of immediate minerals.*

Initially, we note that the word "immediate" refers to quantity, location, or position (*i.e.*, in the case *sub judice*, the immediate minerals are those under the Surface Owners' surface estates); "immediate" does not refer to a due diligence requirement. This usage is borne out by cases long before *Middleton*, *see, e.g.*, *Myers v. Sanders' Heirs*, 7 Dana 506, 37 Ky. 506, 517 (1838) ("He who purchases from the fraudulent vendee, with a knowledge of the fraud, and therefore with an intention to withhold the property from the defrauded vendor, is in fact a party to the fraud, and ought not to occupy any better attitude than that of his *immediate vendor*.") (emphasis added); in foreign jurisdictions around the same

---

[8] In an interlocutory order denying a motion for summary judgment entered years prior to trial, the Trial Court appears to have interpreted *Middleton* as requiring active mining. "It is well settled in this Commonwealth that the denial of a motion for summary judgment is interlocutory and is not appealable." *Roman Catholic Bishop of Louisville v. Burden*, 168 S.W.3d 414, 419 (Ky. App. 2004) (citations omitted). Accordingly, the Trial Court operated well within its rights to change its legal conclusion, reject an active mining requirement at trial, and enter a judgment in conformity with the jury's verdict.

time as *Middleton*, *see*, *e.g.*, *Reiners v. Humble Oil & Refining Co.*, 192 La. 415, 417, 188 So. 47, 48 (La. 1939) ("immediate mineral grantees"); and in modern usage, *see, e.g.*, *Nash v. Campbell County Fiscal Court*, 345 S.W.3d 811, 821 (Ky. 2011) (Noble, J., concurring in part and dissenting in part) (referring to existing landowners as "immediate property owners" with "the present and immediate rights of the landowners").  Among the definitions of "immediate" in Black's Law Dictionary is included the phrase, "Not separated by other persons or things <her immediate neighbor>," and a synonym given is "Proximate."  (11th ed. 2019.) Proximate is similarly defined as "1. Immediately before or after. 2. Very near or close in time or space."  *Id*.  Thus, the "immediate minerals" words in *Middleton* refer simply to the minerals existing immediately under the surface, and its use in *Middleton* serves to differentiate the minerals immediately under the surface property from those foreign minerals that were being transported through the tunnels.

Notwithstanding this consistent usage of "immediate," the Surface Owners principally rely on *Cawood v. Hall Land & Mining Company*, 293 Ky. 23, 168 S.W.2d 366 (1943), to claim that a mineral lessee has a duty to mine with due diligence or otherwise abandon or lose the ability to use the tunnels and voids. This argument misapplies *Cawood*, as *Cawood* resolved the question of whether a lessee could game its lessor and use the tunnels and voids to transport foreign

minerals while avoiding paying large royalties under its mineral lease by simply not mining any minerals in a portion of the mine.

*Cawood* was an action for an accounting brought by the lessor of a coal lease, not an action brought by a surface owner against a mineral lessee. The *Cawood* Court ultimately imputed a due diligence requirement to mine actively on the part of the lessee because the lessee was seeking to pay minimal royalties to the lessor by not actively mining while still utilizing the right to transport foreign minerals through the lessor's tunnels and voids. That case had nothing to do with the mineral owner's possessory rights to the minerals in place, and, more importantly, the mineral owner did not lose its rights to use the voids and tunnels simply because its lessee was not actively mining.

As it pertains to the instant issue, the lease included a haulage clause, and that Court noted "[i]t is now settled in our jurisdiction that a lessee of coal rights has the right, during the time that he may under the lease mine coal on the leased premises, to use the underground passages for the removal of coal mined on other premises[.]" 168 S.W.2d at 370 (citing *Middleton*, *supra*). The question of whether the lessee or the owner had such a right "was not free from doubt in the year 1920 when the contract in question was executed." *Cawood*, 168 S.W.2d at 370. Because such a doubt existed when the contract was executed in *Cawood*, the Court believed "it was the intention and purpose of the contract provision dealing

with haulage to dispose of this doubt and confer such haulage rights *as it is now settled would be conferred by law* in the absence of the contract provision." *Id.* (emphasis added).

Separate from the haulage rights, that Court read into the contract a due diligence requirement on the part of the lessee because the lease payments were dependent on the amount of coal that was mined. "The authorities seem to be in accord that under a lease of this nature containing a provision for the payment of royalties it is the lessee's duty to develop the leased premises to the mutual profit of himself and the lessor and included in this duty is the obligation to mine the product within a reasonable time." 168 S.W.2d at 369. Accordingly, because the lease terms required due diligence, the Court interpreted the haulage rights in the lease as applying "only during the period it was necessary to maintain the underground passages for the removal of coal mined on the leased property." *Id.* at 370. The evidence was that with due diligence, they could have mined the immediate coal in six years. *Id.* at 369-70. Thus, during that period of time, the lessee was not liable to pay for the right to haul foreign minerals. *Id.* at 371.

*Cawood*'s holding as it relates to a due diligence requirement for mining is a *non sequitur* to the case *sub judice*. *Cawood* was brought by the lessor for an accounting of the lessee's activity pursuant to a lease. The instant case was brought by the Surface Owners against a lessee. Any due diligence or active

mining requirement was only imputed in *Cawood* because the lease involved a payment of royalties, and it would be unjust to permit a lessee to refrain from active mining so that it could reap other benefits of the lease (*i.e.*, using the mining voids and tunnels), while avoiding paying the royalties. The instant case does not involve a similar royalty, as River View has already paid millions of dollars to the lessor and continues to pay hundreds of thousands of dollars, including taxes and other fees, to maintain its rights under the lease. Accordingly, *Cawood* does not stand for the proposition that *Middleton* requires active mining to maintain the right to use mine voids and mining works.

In fact, *Cawood* implicitly affirms that the right to use the tunnels and mine voids exists with or without active mining. The lessor in *Cawood*, being the mineral rights owner, did not lose its right to compensation for hauling foreign minerals through the voids and tunnels just because the lessee was not actively mining. 168 S.W.2d at 370-71. The Surface Owners' claim that "*Cawood* made clear that timeliness and 'due diligence' is required for the extraction of immediate minerals" is inapposite to the holding of *Cawood*.

Additionally, *Hall v. Landrum*, 470 S.W.2d 830 (Ky. 1971), which the Surface Owners claim supports their "other lawful purposes" argument, erodes both their "immediate" and "other lawful purposes" arguments. The facts in *Hall* are not largely relevant as that Court, much like the *Cawood* Court, ultimately

-23-

decided the case based on the contractual provisions regarding passageway rights in the coal lease. Nonetheless, *Hall* involved the use of underground passages and mine voids to transport foreign coal, and while discussing the case law pertaining to mining passageway usage, the Court summarized *Middleton* as follows:

> In *Middleton v. Harlan-Wallins Coal Corporation*, 252 Ky. 29, 66 S.W.2d 30, it was held that the correct rule is that '. . . as to subterranean passages and openings made by the extraction of mineral by its owner, or lessee of the right to mine it, the owner or lessee has the right, in the absence of contract restrictions, to use such openings in the transportation of mineral taken from other adjoining or adjacent mining operations without infringing upon any right of the surface owner or committing any trespass to or on his property.' *Id*. 66 S.W.2d at page 30. In approving that rule the court discussed the varying theories upon which other courts had embraced it, concluding that the right to so use the passageways exists only so long as any of the immediate mineral remains in place and it is necessary to maintain the passageways to extract and remove the mineral under the particular surface. Under the rule as so stated, the present lessees had the right to use the passageways on the Noe tract to transport coal extracted from other boundaries so long as coal remained to be extracted from the Noe boundary and the passageways were necessary for its removal, even without any contractual provision.

*Id*. at 833.

Notably, and similar to the case *sub judice*, this right to transport foreign coal in *Hall* existed in spite of lengthy periods of mining inactivity. The lease in *Hall* had been mined by one lessee from 1933 through 1944, then no coal had been extracted from the mine for eight years before a second lessee assumed

the lease, whereupon the new lessee "robbed" coal from some of the pillars in the lease for three years. During that three-year period and for years thereafter, the new lessee "used the Noe tract for the primary purpose of transporting through underground passageways on the Noe tract coal which had been mined from other boundaries." *Id*. at 832. Despite this lengthy passage of inactivity, the lessees maintained the right to transport foreign coal. Also relevant, the right to transport foreign coal existed despite coal only remaining in the pillars.

The case *sub judice* fares no differently than the cases relied upon by the Surface Owners. There is no active mining requirement in *Middleton*. *Middleton* only requires that minerals exist in the mineral estate, and that the tunnels and voids can be used to extract those minerals. Neither the mineral owner nor the lessee has lost the right to use the tunnels and voids because of inactivity or because in some areas coal only remains in the pillars.

### 2. *Other lawful purposes.*

Additionally, the Surface Owners' argument that *Hall* limits "other lawful purposes" solely to the transportation of "immediate minerals" fails. The facts of both *Hall* and *Middleton* only concerned transporting foreign minerals. Yet, *Middleton* made clear that the mineral owner had a right to use the tunnels and voids for "all other lawful purposes[.]" 66 S.W.2d at 31. *Hall* in no way limited

the lawful purposes to the sole transport of foreign minerals.[9]  And it would be strange indeed if the right to use the tunnels and voids was so limited, as the surface owners' rights are not interfered with in any way by the mineral owners' use of the tunnels and voids.

What is clear from the cases relied upon by the Surface Owners is that, absent contractual obligations otherwise, the lessee or the mineral owner has a right to use the tunnels and voids for all lawful purposes, so long as the tunnels or voids are necessary for the removal of the mineral in place under the surface owner's property, even where there is lengthy mining inactivity or the remaining coal is in the pillars.

3. *Real and personal property rights further support no active mining requirement or limitations on lawful activities.*

Furthermore, a review of the nature of the mineral owner's property interest demands that we not diminish the real or personal property rights of the mineral estate owner or by limiting its lawful uses of the estate itself.  There are two prevailing views to ownership of mineral rights – incorporeal and corporeal. The "incorporeal rule" permits the purchaser of the mineral only the "mere right to go upon the property in question and by suitable operations to take the designated

---

[9] Though not argued as such by either side, injecting coal slurry into voids could also be viewed as transportation of foreign materials because coal slurry does contain some foreign-mined minerals.

substances therefrom." *Trimble v. Kentucky River Coal Corp*, 235 Ky. 301, 31 S.W.2d 367, 369 (1930). The "corporeal rule" provides that the mineral purchaser acquires the right to go upon the property and take the substances and the right to own the substances themselves. *Id*. Kentucky adopts the corporeal rule; thus, "these oil, gas, coal, and mineral rights are real estate owned in fee simple." *Id*.

Accordingly, "[m]inerals in place are land. They are subject to conveyance. The surface right may be in one man, and the mineral right in another. Both, in such a case, are land-owners; they own separate and distinct corporeal hereditaments." *Kincaid v. McGowan*, 9 Ky. L. Rptr. 987, 88 Ky. 91, 4 S.W. 802, 804, 13 L. R. A. 289 (1887). As a corporeal hereditament, the fee simple owner of a mineral estate cannot abandon its estate. *Scott v. Laws*, 185 Ky. 440, 215 S.W. 81, 82 (1919) ("Since there was a severance of the mineral estate from the surface estate, the owner of the minerals did not lose his right or his possession by any length of nonuser . . . ."). *See also Cox v. Colossal Cavern Co.*, 210 Ky. 612, 276 S.W. 540, 544 (1925) ("The *Scott* Case holds that the owner of minerals beneath the surface cannot lose his rights by any length of nonuser."). *See also Curtis-Jordan Oil & Gas Co. v. Mullins*, 269 Ky. 514, 106 S.W.2d 979, 981 (1936) ("Where, as in this instance, there has been a severance of the mineral estate from the surface estate, the owner of the former does not forfeit or lose his right or possession by any length of nonuser and the owner of the surface cannot

-27-

acquire title to the minerals thereunder by an exclusive and continued ownership or occupancy of the surface merely.") (citations omitted); *McPherson v. Thompson*, 203 Ky. 35, 261 S.W. 853, 854 (1924) ("When thus separated [from the surface estate], minerals are subject to all the rules of possession and conveyance by which other real estate is governed, and the owner may invoke every legal right to assert and defend his title that is provided for owners of title in fee to the surface . . . ."). *Cf. Duncan v. Mason*, 239 Ky. 570, 39 S.W.2d 1006, 1009 (1931) ("'*Except in the case of a perfect legal title to a corporeal hereditament*, every right or interest in, title to, or ownership of property may be lost by abandonment.'") (emphasis added) (quoting *United Mining Co. v. Morton*, 174 Ky. 366, 192 S.W. 79, 83 (1917)).

In addition to the strong, un-abandonable real property interests the coal estate owner possesses, the coal estate owner or lessee also typically has personal property in the tunnels and voids that are used in the mining operation, including, for example, extraction, haulage, and ventilation equipment. Moreover, the coal refuse itself has also been deemed by our Courts to be valuable personal property of the mining company. *Cf. Elk Horn Coal Corp. v. Allen*, 324 S.W.2d 829 (Ky. 1959) (holding a slate dump resulting from a coal mining operation was valuable personal property). As the refuse is valuable personal property, even it may not be abandoned without a "showing of actual acts of relinquishment,

-28-

accompanied with the intention to abandon." *Id.* at 830 (citations omitted). "Mere lapse of time and nonuser, unaccompanied by any other evidence showing intention, have been generally held not enough to constitute an abandonment." *Id.* It may sit for a long time because its economic value waxes and wanes, but just because it sits for years it is not considered abandoned. *Id.* at 831.

What, then, is the difference between a mineral owner or a lessee lawfully storing its mining equipment in tunnels versus lawfully storing its coal refuse in voids while the mining operation continues throughout the seam? All of it is valuable personal property, and all of it is used by the mining company to serve its principal goal – to make a profit. *See, e.g.*, Monica Hobson Braun, *Rock of Ages: Why Kentucky's Use of the Abandonment Test in Deciding the Ownership of Mineral Refuse Is Inadequate*, 97 KY. L.J. 293 (2009) ("The determination of whether the mineral refuse constitutes personal property or real estate has great financial magnitude, as the prevailing party will possess commercially valuable minerals.").

River View is lawfully storing its valuable personal property in a mine in which River View has the right to do so by both contract and permit; *Middleton* and Kentucky's real and personal property rights allow as much.

Additionally, even if the usage of the tunnels and voids could be lost by abandonment, showing abandonment of mining usage is challenging given the

large-scale nature of mining operations. For example, in the more stringent context of zoning laws, nonconforming uses are to be "gradually eliminated and are to be held strictly within their boundaries." *Legrand v. Ewbank*, 284 S.W.3d 142, 145 (Ky. App. 2008). Nonetheless, this Court has held that mining operations are unique, and if the owner is demonstrably dedicated to mining any part of the mine, such use can be imputed to the entire mine because, "[a]s a practical matter, it is not feasible for a mine operator to conduct mining operations over the entire property." *Id*. at 146. Referring to minerals as a diminishing asset, this Court adopted the following reasoning from the Illinois Supreme Court:

> *We think that in cases of a diminishing asset the enterprise is 'using' all that land which contains the particular asset and which constitutes an integral part of the operation, notwithstanding the fact that a particular portion may not yet be under actual excavation.* It is in the very nature of such business that reserve areas be maintained which are left vacant or devoted to incidental uses until they are needed. Obviously, it cannot operate over an entire tract at once.

*Id*. (emphasis in original) (quoting *Du Page County v. Elmhurst-Chicago Stone Co.*, 18 Ill.2d 479, 484-485, 165 N.E.2d 310, 313 (1960)).

Notably, this Court held an active mining requirement to be an "impractical limitation" to protect a nonconforming use and imposed only a requirement that the area was "demonstrably dedicated to that use." *Id*. at 146. Thus, in *Legrand*, the entire 227-acre sand-and-gravel mining operation was

-30-

demonstrably dedicated to such use where mining was occurring on part of the property, an on-site screening and sizing facility was used for the whole mining operation, and stockpiles of mined minerals were kept for sale. *Id.*

Though the case *sub judice* does not involve a nonconforming use, River View's mining operations throughout the seams would undoubtedly meet this stricter "demonstrably dedicated" test as River View continues to mine these seams beyond the Surface Owners' properties; it has a large surface impoundment and mining facility that it uses for the overall mining operation; and it is actively selling the minerals it mines.

The *corpus* of Kentucky property law as it relates to mineral estates, and coal specifically, gives the mineral estate owner or lessee broad rights to create and use mining works, tunnels, and voids in furtherance of the operation. *Middleton* aptly permitted the mineral estate owners and lessees all lawful uses of the tunnels and voids, proscribing only unlawful uses. We will not disturb this longstanding jurisprudence.

4. *Abandonment by definition.*

Though these bedrock legal principles all support River View's right to use the mine, including its tunnels and voids, for all lawful purposes, the Surface Owners further claim River View has abandoned the mine and lost its use of the tunnels and voids due to a technicality – some of the mines have been placed in

-31-

abandoned status.  *See* KRS 352.010(1)(a) ("'Abandoned workings' means excavations, either caved or sealed, that are deserted and in which further mining is not intended, or open workings which are ventilated and not inspected regularly[.]").  But classify the mine however you will, we have long accepted as true, "'That which we call a rose by any other name would smell as sweet.'" *Huggins v. Caldwell*, 223 Ky. 468, 3 S.W.2d 1101, 1103 (1928).  "[I]t is not so much the expressed name that determines the actual classification, but it is the substance of the thing that points to its true designation." *Id.*  In other words, an abandoned mine is still a mine, and testimony at trial established that "abandoned" is simply a regulatory status that can change to "active" in the future.

Indeed, coal estate owners in Kentucky have broad discretion to decide the timing of the mining of their minerals, as a mining operation must take into account numerous factors when deciding where and when to actively mine. Deciding that a 30-year failure to conduct any mining activities did not constitute an abandonment triggering a reversionary interest, our highest Court has previously noted:

> Being the owner of the coal and other minerals, Peabody was under no duty to mine them, unless, of course, there was some compulsion contained in the deed.  This court can, and does, take judicial cognizance of the fact that there are many reasons why a particular tract of coal is mined or not mined.  For example, did Peabody own other lands in the vicinity that could be mined?  Was Peabody operating other mines in the vicinity?  Was the

market price of coal such as to warrant its mining? Were the physical surroundings such as to induce going after the coal? Had engineering studies and assurances been received that there was coal in sufficient quantity and quality to justify its being mined? Were explorations being made that would affect mining on the subject property? So, on and on.

*Holladay v. Peabody Coal Co*., 560 S.W.2d 550, 554-55 (Ky. 1977).

This reasoning is sound in the instant case. We are pointed to no clause in any deed that required active mining. *Middleton* requires no active mining. And Kentucky property law likewise requires none.

In summary, the mineral estate owner and lessee have strong real and personal property interests because: (1) the mineral estate cannot be abandoned by nonuse; (2) the mineral refuse is valuable personal property that cannot be abandoned absent a showing of intent to so abandon; and (3) a mine's nonconforming use is not lost under a particular surface estate if the overall operation is demonstrably dedicated to mining. These strong property interests lead us to the same conclusion as *Middleton*: if there remain minerals in place under a particular surface, a.k.a. the "immediate minerals," and the tunnels and voids are necessary to mine the minerals, the right to use the tunnels and other subterranean passages for all lawful purposes is not abandoned either.

Now, it is true that the leaseholder of mineral rights may, in certain circumstances, abandon its *lease* to the *lessor*. *United Mining Co. v. Morton*, 174

-33-

Ky. 366, 192 S.W. 79 (1917). But in the instant case the lessor is not even a party to this action. Also, River View proffered evidence that it continued to mine under other properties, continued to pay rent to its lessor, and never intended to abandon its lease. *Cf. Reis v. Norton Coal Corp.*, 346 S.W.2d 8, 9-10 (Ky. 1961) (noting that with mineral leases "in no case has this Court adjudged an abandonment where the lessee had continued to pay minimum royalties in a substantial amount. . . . Here, lessee continued to recognize and observe the contract in regard to paying minimum royalties, pumping water, and paying taxes and insurance."). More importantly, the Surface Owners, who are not the lessors, have no standing to assert abandonment of the lease. *See, e.g.*, *Bigge v. Tallent*, 539 S.W.2d 288, 290 (Ky. 1976) ("the owner of the surface estate is without standing to bring and prosecute any action which would culminate in the cancellation of an oil and gas lease executed by the owners of the mineral estate").

Finally, we note that while our sister states have variously implemented legislation requiring active mining lest the mineral interests be extinguished and revert to the surface owner after a period of years, *see, e.g.*, *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S. Ct. 781, 70 L. Ed. 2d 738 (1982) (holding Indiana's Mineral Lapse Act constitutional where it reverts mineral interests to surface owners after 20 years of inactivity), and *Farnsworth v. Burkhart*, 21 N.E.3d 577 (Ohio App. 2014) (discussing Ohio's Dormant Mineral

Act), Kentucky has no similar provision and, in fact, goes farther and renders most reversionary interests largely invalid. *See* KRS 381.221; *Unknown Heirs, Devisees, Legatees and Assigns of Devou v. City of Covington*, 815 S.W.2d 406, 413 (Ky. App. 1991) (noting KRS 381.221 does not violate the Kentucky or the United States Constitutions). To read into *Middleton* an active mining requirement, or, more appropriately, to read *Middleton* as creating a reversionary interest to the Surface Owners following an abandonment, would simply not comport with Kentucky law.

iii.    *The applicable law supports the Trial Court's ruling.*

Under the applicable law, the Trial Court properly denied the Surface Owners' motion for a directed verdict. There was sufficient evidence adduced at trial to satisfy all of *Middleton*'s elements. The "immediate mineral" existed in all three seams, and in one seam it had never been touched. The tunnels and other openings were necessary for removing the mineral, as they were adjacent to the minerals, and the testimony established that the mains and sub-mains could be used to access the coal. Likewise, River View acted lawfully and received valid permits to store the coal slurry in the voids. Accordingly, the jury's verdict was not "palpably or flagrantly against the evidence so as to indicate that it was reached as a result of passion or prejudice." *Bierman*, 967 S.W.2d at 18. The Trial Court

neither erred by denying the Surface Owners' motion for directed verdict nor by entering a judgment in favor of River View.[10]

### B. Did the Trial Court err in its jury instructions?

The Surface Owners next argue that the Trial Court's jury instructions were erroneous. Specifically, they claim that the instructions did not require the jury to find there was active mining. As *Middleton* does not require active mining, the Trial Court did not err by omitting the same from its jury instructions.

"A properly preserved challenge to the contents of a given jury instruction is a question of law subject to de novo review on appeal." *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 709 (Ky. 2020) (distinguishing between challenges to contents, which are reviewed de novo, and challenges to giving or failing to give particular instructions, which are reviewed under an abuse of discretion standard). Kentucky's approach to jury instructions requires a Trial Court to "provide only the bare bones, which can be fleshed out by counsel in their closing arguments if they so desire." *Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky. 1974).

Bare-bones instructions do not include evidentiary presumptions or other unnecessary details; rather, they provide a framework that includes the

---

[10] Having found that the jury's verdict is not palpably or flagrantly against the evidence and the Trial Court did not err, we do not address the merits of River View's protective cross-appeal, including its argument that we should adopt the container space rule.

-36-

essential aspects of the law necessary for a jury to resolve each dispositive factual issue. *Norton Healthcare*, 600 S.W.3d at 723 (citing *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 824 (Ky. 1992); *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005); and *Mason v. Commonwealth*, 565 S.W.2d 140, 141 (Ky. 1978)). In other words, Trial Courts "are called upon to engage in a balancing effort to ensure that jury instructions in Kentucky provide only the bare minimum necessary to ensure that the jury understands the ultimate issue of fact to be decided in any case, but still provide enough law and background knowledge so that the jury comes to a decision that is supported by law." *Id.*

Additionally, even if we were to find the jury instructions violated the bare-bones approach, we would need additional analysis before determining a new trial was warranted. If the jury instruction misstated the law by failing to sufficiently advise the jury regarding the elements it had to believe from the evidence to return a verdict in favor of the party with the burden of proof, then a presumption of prejudice would be created, and the challenging party would be entitled to a new trial unless the opponent affirmatively shows that the error did not affect the verdict. Conversely, if there is no misstatement of the law in the jury instructions, then no presumption of prejudice arises, and the complaining party cannot obtain a new trial unless the party affirmatively shows prejudice, "meaning that the error affected the verdict." *Id.* at 724 (citations omitted).

Using these standards, we now turn to the jury instructions in the case

*sub judice*.  The complained-of portion of the jury instructions reads as follows:

**INSTRUCTION NO. 1**

> *Middleton v. Harlan-Wallins Coal Corp.*, 66 S.W.2d 30 (Ky. 1933) is the only Kentucky case that addresses the issue of void use as between the severed coal owner and the surface owner.  *Middleton* was a case that dealt with the general premise of situations involving the "right of the owner of minerals in place to the use referred to of the subterranean tunnels, openings, and excavations made by him in extracting the immediate mineral." *Middleton* at 33-35.
>
> In *Middleton*, the Court adopted the following:
>
> That **so long as there is any of the immediate mineral in place**, the owner of it, or the one who has the right to extract it, **may use the tunnels and other necessary subterranean passages and openings**, not only for the removal of the mineral taken therefrom and embedded under the same surface rights, but also for all other lawful purposes **so long as it is necessary to maintain such openings** to extract and remove the mineral under the particular surface. *Middleton* at 32-33.
>
> **THE COURT INSTRUCTS AS FOLLOWS:**
>
> 1) If you find that, at the time of the alleged trespass, (1) there was no immediate mineral in place under Plaintiffs' properties; **or** (2) it was not necessary to maintain the openings to extract and remove the mineral under Plaintiffs' properties; **or** (3) there was clear, unequivocal, and decisive evidence that the mine below Plaintiffs' properties was abandoned, you shall find for Plaintiffs.

2) If you find that, at the time of the alleged trespass, (1) there was immediate mineral in place under Plaintiffs' properties; **and** (2) it was necessary to maintain the openings to extract and remove the mineral under Plaintiffs' properties; **and** (3) there was not clear, unequivocal, and decisive evidence that the mine below Plaintiffs' properties was abandoned, you shall find for River View Coal, LLC.

## **VERDICT FORM 1A**

We the jury, find that at the time of the alleged trespass, (1) there was no immediate mineral in place under Plaintiffs' properties; or (2) it was not necessary to maintain the openings to extract and remove the mineral under Plaintiffs' properties; or (3) there was clear, unequivocal, and decisive evidence that the mine below Plaintiffs' properties was abandoned, you shall find for Plaintiffs.

. . .

## **VERDICT FORM 1B**

We the jury, find that at the time of the alleged trespass, (1) there was immediate mineral in place under Plaintiffs' properties; and (2) it was necessary to maintain the openings to extract and remove the mineral under Plaintiffs' properties; and (3) there was not clear, unequivocal, and decisive evidence that the mine below Plaintiffs' properties was abandoned, you shall find for River View Coal, LLC.

The jury checked "Yes" under Verdict Form 1B.

The Surface Owners' proposed jury instructions were similar but

added:

The word "immediate" is to mean minerals that are currently present and being actively mined. The owner

of the minerals in place has the right to use the voids in extracting the immediate mineral until such time as the owner of the minerals ceases mining after which the owner of the mineral loses his/her right to use the voids.

Once the owner of the minerals loses the right to use the voids, the surface owners have a right to prohibit the use of the voids.

. . .

1) If you believe that the defendant, River View Coal, LLC is not actively mining immediate minerals in place under Plaintiffs' properties OR that the Ohio No. 11 and Uniontown No. 9 mines were abandoned, then you shall find for the Plaintiffs.  This means that Plaintiffs own the voids.

2) If you believe that the defendant River View Coal, LLC is actively mining immediate minerals in place under Plaintiffs' properties AND that the Ohio No. 11 and Uniontown No. 9 mines were not abandoned, then you shall find for the Defendant.

Having reviewed the controlling law as compared to the facts of this case, we hold that the Trial Court's instructions were not erroneous as they followed verbatim *Middleton*'s language, as shown above in our holding on the directed verdict issue.

The Surface Owners at minimum agree with the *Middleton* language that was used by the Trial Court.  Indeed, their briefs before this Court repeatedly refer to the exact language from *Middleton* that the Trial Court used in its jury instructions as "black letter law" and a "blueprint of the true ownership of the

-40-

voids." Unquestionably, to the extent that *Middleton* is a correct pronouncement of the law regarding mine void use, the Trial Court's instructions verbatim recited the controlling language.

But the Surface Owners desired more than the bare-bones law. They desired to read into *Middleton*'s third element an active mining requirement, which we have already shown does not exist. Any of the Trial Court's interlocutory orders that read an active mining requirement into *Middleton* were erroneous on this issue, but that error was not final; it was ultimately corrected at trial; and it is reflected in the judgment entered in favor of River View that is the subject of this appeal.

Regardless, the Surface Owners could have made their active-mining argument at closing, as it is not the purpose of the bare-bones jury instructions to flesh out "legal nuances" that may be inferred from the instructions. *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 230 (Ky. 2005). For example, jury instructions that informed the jury that parties had a duty to refrain from crossing an intersection when the traffic signal was red, the instructions did not need to also state that one had a right to cross on other colors, ". . . and if counsel felt that the jury was too thick to get the point all he had to do was to explain it in his summation." *Cox*, 510 S.W.2d at 535. Here, the instructions stated precisely the law on which

*Middleton* expounded, and the Surface Owners' active mining argument was ". . . not appropriate for inclusion in the court's instructions to the jury." *Id*. at 534.

Stated another way, even if the Surface Owners' proposed instructions were correct, "[t]he controlling issue is not which set of proposed instructions best stated the law, but rather whether the delivered instructions misstated the law." *Olfice*, 173 S.W.3d at 230. The Trial Court's instructions accurately quoted the law from *Middleton*.[11] Such language is sufficient to meet the bare-bones requirement, and we affirm the Trial Court on this issue.

## C. Did the Trial Court err by permitting Thomas Wynne to testify?

The Surface Owners further allege error with River View's corporate representative, Thomas Wynne (hereinafter, "Wynne"), testifying at the end of River View's case. The Surface Owners erroneously aver that Wynne was "never noted as a specific witness or an expert witness" and "never disclosed as a witness prior to trial." Appellant's Brief at 41. They also state that no CR 26 expert disclosure was filed on his behalf. The Surface Owners claim that Wynne testified to "far-off undeveloped technologies River View planned to engage in of which

---

[11] Though the instructions accurately quoted *Middleton*, they also required the jurors to find an additional element – that the mines had not been abandoned. As we have stated, the mineral estate could not have been abandoned, thus the owner or lessee could not abandon the lawful uses of tunnels and voids that could be used to extract the remaining minerals. Additionally, while a lessee may abandon a lease, only the lessor would have standing to raise such a claim, and none of the Surface Owners are the lessors of River View's lease. In spite of the error, the jury rejected the claim that the mine was abandoned; thus, its inclusion resulted in no harm and does not constitute reversible error.

[the Surface Owners] had no recourse to cross-examine with." These allegations are not borne out by the record.

River View responds that Wynne was disclosed years before trial as Vice President of River View, and that Wynne was, in fact, disclosed prior to trial on River View's amended witness list. Indeed, the record shows that River View amended its witness list because the Trial Court permitted the Surface Owners to amend their Complaint a week before trial to add a claim of unjust enrichment and to add a new witness. Consequently, the record shows that River View's amended witness list designated Wynne as the "client representative" who was expected to testify.

After receiving this list, the Surface Owners filed a motion to exclude Wynne's testimony, claiming Wynne had never been disclosed, and they had "never heard of" Wynne during the half decade of litigation leading up to the trial. River View proffered a discovery response that it delivered to the Surface Owners many years before trial listing Wynne as a vice president of River View.

The Trial Court denied the motion, finding that Wynne could testify as a corporate representative as he was "previously disclosed," "is intimately aware of and familiar with River View Coal's internal operations," and was being called to testify regarding the "new cause of action added by" the Surface Owners. Wynne, the Trial Court held, was "not being called as an expert witness."

-43-

At trial, River View called Wynne to testify.  Almost two hours into his testimony, the Surface Owners objected to Wynne testifying about coal slurry cost projections.  During the ensuing bench conference, the Surface Owners re-raised their objection to Wynne testifying at all, claiming they were unprepared to cross-examine Wynne because the details of his testimony had not previously been disclosed.  River View reiterated the above history and further noted that it had been ordered prior to trial to provide a detailed explanation of Wynne's anticipated testimony.  Consequently, River View informed the Trial Court that prior to trial it told the Surface Owners that Wynne was:

> . . . expected to give testimony as a corporate representative regarding River View's formation and business operations and activities as they relate to the claims in this case, including claims regarding measure of damages, to rebut the claim that they own the subject property, Plaintiffs' claim of unjust enrichment, additionally, although anticipated, whatever your new witnesses are adding.

The Trial Court overruled the objection.  Wynne then testified to, among other issues, the costs the company incurred for coal slurry injection, the property and unmined minerals taxes paid pursuant to the lease, the design and function of the "mains" through which coal can be mined, the decades it took to make the mains that currently exist, the manner in which River View could extract the coal slurry in the future if it decided to do so, and the negative effects on coal mining if surface owners owned mine voids and could prohibit access to the voids

-44-

and tunnels. Wynne also testified that River View was conducting research and development, in collaboration with government authorities, into potentially harvesting rare earth metals from coal slurry.

On appeal, the Surface Owners claim that Wynne's testimony was erroneously admitted as expert testimony in violation of CR 26.02(4). Initially we note that the Surface Owners' assertion to this Court that Wynne was never noted as a "specific witness to testify" for River View strains credulity,[12] as he was

---

[12] The Surface Owners also state that Wynne "was designated as a corporate representative to sit at counsel table and listen to all the testimony of the case." Appellant's Brief at 18. This characterization is grossly underwhelming because Wynne was expected to testify, not just listen. River View's Amended Witness List specifically stated: "Tom Wynne – Alliance Coal, LLC c/o Stoll Keenon Ogden PLLC. Mr. Wynne *is expected to give testimony* as a client representative." Amended Witness List at 2 (emphasis added). The Surface Owners *clearly* understood that Wynne would be testifying, not just sitting at counsel table and listening to the testimony of the case, as the pre-trial Motion to Exclude Undisclosed Witness Testimony repeatedly sought to exclude the "testimony" of Wynne:

- ". . . any *testimony* by this witness . . ." Motion at 1 (emphasis added).

- ". . . Plaintiffs having no knowledge of the subject matter, scope, or nature of Mr. Wynne's *testimony*." Motion at 1 (emphasis added).

- "Plaintiffs have no idea what Mr. Wynne will *testify* to." Motion at 2 (emphasis added).

- "River View now intends to introduce *testimony* from Mr. Wynne who River View states in its amended witness list will *testify* as a 'client representative.'" Motion at 2 (emphasis added).

- ". . . the *testimony* of Mr. Wynne . . ." Motion at 2 (emphasis added).

- "Mr. Wynne's *testimony* should be excluded . . ." Motion at 3 (emphasis added).

- " . . . KRE 403 justifies the preclusion of the requested *testimony* in this case." Motion at 3 (emphasis added).

included on the amended witness list by River View, he was the subject of the Surface Owners' pre-trial motion to exclude his testimony, and River View gave the Surface Owners a description of what his anticipated testimony would entail. Likewise, it does not appear that Wynne gave any expert testimony, nor was he ever qualified as an expert.

The Surface Owners' shaky recitation of the facts notwithstanding, we find no error with Wynne sitting at counsel's table and testifying as a corporate representative. KRE[13] 615. Accordingly, we affirm the Trial Court on this issue.

**D. The Surface Owners' remaining allegations of error**.

The Surface Owners raise additional claims of error: an evidentiary claim about a testing report that was used to determine if sludge was coal slurry or thickener underflow; an evidentiary claim about an expert testifying to undisclosed opinions about damages; and a claim regarding failure to give a jury instruction on punitive damages. River View argues that the claims all concern alleged facts or legal errors that ultimately were not dispositive, as the jury rejected the principal

---

- "If Mr. Wynne is allowed to *testify* at trial . . ." Motion at 3 (emphasis added).
- ". . . enter an order excluding the *testimony* of the undisclosed witness . . ." Motion at 3 (emphasis added).

- ". . . the proposed *testimony* of Mr. Wynne." Motion at 3 (emphasis added).

[13] Kentucky Rules of Evidence.

claim that River View did not have a right to use the mine voids. River View avers that any error was harmless. CR 61.01.

We agree with River View. "When considering a claim of harmless error under CR 61.01, the court determines whether the result probably would have been the same absent the error or whether the error was so prejudicial as to merit a new trial." *CSX Transp., Inc. v. Begley*, 313 S.W.3d 52, 69 (Ky. 2010) (citations omitted). Even assuming all the allegations constitute error, they had no bearing on the threshold issue of whether River View had a right to use the mine voids. Accordingly, the result would have been the same with or without these alleged errors, and we affirm the judgment entered by the Trial Court.

### E. River View's Protective Cross-Appeal.

River View filed a protective cross-appeal in accordance with *Smith v. Wal-Mart Stores, Inc.*, 6 S.W.3d 829 (Ky. 1999), raising four allegations of evidentiary error and one summary judgment issue. As we are affirming the judgment entered in favor of River View, its issues raised in its protective cross-appeal are moot, and the Court ORDERS Cross-Appeal No. 2022-CA-0145-MR DISMISSED.

### CONCLUSION

For the foregoing reasons, Appeal No. 2022-CA-0095-MR is AFFIRMED, and Cross-Appeal No. 2022-CA-0145-MR is DISMISSED.

ALL CONCUR.

ENTERED: _August 4, 2023____    _____

JUDGE, COURT OF APPEALS


BRIEFS FOR
APPELLANTS/CROSS-
APPELLEES:

John C. Whitfield
Sarah Whitfield Bearden
Madisonville, Kentucky

Stephen M. Arnett
Morganfield, Kentucky

ORAL ARGUMENT FOR
APPELLANTS/CROSS-
APPELLEES:


John C. Whitfield
Madisonville, Kentucky

BRIEF FOR APPELLEE/CROSS-
APPELLANT:

P. Douglas Barr
Dana R. Howard
Lexington, Kentucky

ORAL ARGUMENT FOR
APPELLEE/CROSS-APPELLANT:


P. Douglas Barr
Lexington, Kentucky